## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| OSCILLOSCOPE PICTURES, INC., | ) | Civil No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | **& JURY DEMAND** |
| DEAFUEH MONBO and TAJE MONBO, | ) | |
| both individually and doing business as | ) | |
| 12 O'CLOCK BOYZ, | ) | |
| | ) | |
| Defendants. | ) | |

Oscilloscope Pictures, Inc. ("Oscilloscope" and "Plaintiff"), by its attorneys Meloni & McCaffrey, a Professional Corporation, as and for its Complaint, alleges as follows:

### INTRODUCTION

"12 O'Clock Boys" (the "Documentary") is a 2013 documentary film made over a five-year period and directed by the then student filmmaker, Lotfy Nathan. While the Documentary's foundation is the loosely bonded band of urban dirt-bike and four-wheeler quad riders known as the 12 O'Clock Boys, based in Baltimore, Maryland, and includes live and historical footage, interviews and commentary from several of its members, its story is centered around one 13 year old boy's fascination with the group and the illegal vehicles they brazenly ride through the streets of Baltimore.  The Documentary follows the evolution of a boy, known as "Pug" (Ty'quan Ford), and his family over a three-year period, wherein he battles his conflicting desire to satisfy the more traditional expectations of his mother, "Coco", and his desire to join the 12 O'Clock Boys.  Pug is the heart of the piece, and his story is the narrative thread that transforms the film.

Oscilloscope obtained the rights to distribute the Documentary in 2013, and has successfully done so, without challenge, until November 2017 when Defendant Deafueh Monbo decided he would capitalize upon the success of the long running Documentary by threatening Oscilloscope's licensees and distributors with legal action based on fraudulent trademark registrations and questionable copyright title. This action for declaratory judgment is brought to clear Oscilloscope's title to its intellectual property and salvage its reputation in the film industry.

## JURISDICTION AND VENUE

1.      This Court has original and exclusive subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 2201, 1331 and 1338(a) because of the federal questions raised pursuant to the Declaratory Judgment Act and since some of the claims alleged herein concern federal questions which arise under the Trademark Act of 1946, as amended (the "Trademark Act"), 15 U.S.C. § 1114, et. seq., and Copyright Act of 1976, as amended (the "Copyright Act"), 17 U.S.C. §101 et seq.

2.      Venue is proper in the Southern District of New York under 28 USC §1391 where the Defendants are subject to personal jurisdiction and are doing business, and where the acts complained of occurred or originated in such district. Venue is also proper in this judicial district pursuant to 28 U.S.C. §1400(a).

## PARTIES

3.      Plaintiff Oscilloscope is a corporation formed in 2008 under the laws of New York, and operates as a film distribution company. It's offices and principle place of business is New York City.

4.     Upon information and belief, Defendant Deafueh Monbo ("Deafueh") is a Certified Public Accountant living and practicing in Owings Mills, Maryland.

5.     Upon information and belief, Defendant Taje Monbo ("Taje") is a resident of Owings Mills, Maryland.

6.     Upon information and belief, Defendants conduct business through an unincorporated entity known as "12 O'Clock Boyz", including within the jurisdiction and venue of this Court.

7.     To the extent that Defendant Taje is asserting any rights in any trademark or copyright through the unincorporated entity 12 O'Clock Boyz, then the conduct of Defendant Deafueh d/b/a 12 O'Clock Boyz is attributable to Defendant for jurisdictional purposes.

## SUMMARY OF FACTS

### A.  The "12 O'Clock Boys" Dirt Bike Riders.

8.     Riding "twelve o'clock" refers to a vertical wheelie, when the bike or four-wheeler being ridden is perpendicular to the street.

9.     The 12 O'Clock Boys is a loosely affiliated group of dirt bike and quad riders, named for the "12 O'Clock" signature trick they pride themselves on, whose ever evolving membership has regularly gathered since the turn of the century to illegally ride *en mass* through the Baltimore Streets, popping wheelies and weaving through vehicle and pedestrian traffic at excessive speeds, while taunting and evading the Baltimore Police.

10.     Michael Whitaker, Jr. a/k/a Pee Wee, is one of the legacies and founding members of the 12 O'Clock Boys.

**B.   The "12 O'Clock Boys" Documentary**.

11.   Lotfy Nathan, the director, filmmaker and creative force behind the Documentary, was introduced to the group in 2009 while still an art student at the Maryland Institute College of Art, in Baltimore.

12.   He would see the group buzzing through the streets of West Baltimore on most weekends and became intrigued by their brazen disregard for the law and mythic outlaw status.

13.   One of Lotfy Nathan's elective classes was in documentary filmmaking, so he decided to film the riders.

14.   He approached a few of the older riders where they gathered in a local park and asked if he could film them and before long he was riding along in a van owned by one of the members, gathering footage of the group's dangerous escapades through the streets of Baltimore.

15.   At some point in 2010, Lotfy decided he would convert his class project into a professional documentary.

16.   Lotfy realized that the interviews and action sequences he had filmed up until that point would not carry the documentary, so he looked to find a specific viewpoint that could tie the documentary together as a cohesive narrative.

17.   One of the locals familiar with the West Baltimore scene introduced Lotfy to a precocious young character named Ty'quan "Pug" Ford, in whom Lotfy had found the narrative thread that would transform what was still a series of independent action sequences and interviews into a cohesive documentary.

18.    Pug, age thirteen at the time, lived with his five siblings and his mother "Coco", a street-wise, single parent struggling to raise her kids without losing them to the unforgiving streets of Baltimore.

19.     Pug was known locally as a dirt bike prodigy, and his highest aspiration was to one day ride with the 12 O'Clock Boys.

20.     Coco, on the other hand, wanted Pug to buckle down in school and become a Veterinarian so that the family could rise above its history.

21.     During the years that followed, Lotfy captured Pug's family's dynamic, their trials and tribulations, including the death of Pug's older brother "Tibba", and wove that storyline throughout Pug's pursuit of his dirt bike driven goal.

22.     Along with capturing his own footage of the group's street escapades and interviews with its current and past membership, Lotfy was provided a copy of a VHS home video styled official street tape of the early days of the 12 O'Clock Boys (the "Home Video") by one of its founding members, and "Legend", Michael "Pee Wee" Whitaker, Jr. ("Pee Wee").

23.     Upon information and belief, Pee Wee is an author of the Home Video under 17 U.S.C. §101 et seq.

24.     Pee Wee also appears in the Home Video.

25.     Upon information and belief, the Home Video's duration is approximately one hour.  It consists of unedited VHS footage of shots of the group riding and performing stunts on the streets of Baltimore, shots of people walking around, someone smacking a woman on her rear end, someone smoking pot, people sitting around in a room talking, and more shots of bikes. There was no progression, story line or structure, very much like a home video.

26.     The Home Video included a "Presents" credit as follows: "12 O'Clock Boys Inc. Presents THE OFFICIAL 12 O'CLOCK BOYZ".

27.     A Maryland corporation named "12 O'Clock Boyz Inc." was formed in 2001 by a person named Danielle Avent from Owings Mills, MD, but it was dissolved in 2002 and is presently inactive.

28.     At the time Pee Wee delivered a copy of the Home Video to Lotfy, he told Lotfy "you can use the [Home Video] tape" in the Documentary.

29.     At or about that same time, Pee Wee signed a release and transfer of rights which provides in relevant part:

> 6. *[I agree] [t]hat if I* perform any original music on the Film, including musical arrangements, titles, lyrics, music and all other elements of such songs ("Music") or *submit any original artwork or photographs ("Photos"), or original audio and/or video recordings ("Recordings") to Producer, I hereby represent and warrant that I own, control or have obtained all rights (including, without limitation, all copyrights) in and to any and all such Music, Photos and Recordings, and I hereby grant to Producer, without charge, the rights necessary to use such Music, Photos and Recordings on and in connection with the Picture and the rights required to exploit the Picture and the ancillary rights therein* as described anywhere in this Talent Release (including, without limitation, in advertisements, promotions and publicity), *in any and all media now known or hereafter devised, or for any purpose, throughout the universe in perpetuity. I hereby represent and warrant that I have obtained all of the rights, clearances, and releases necessary for Producer to exploit said Music, Photos, and Recordings in connection herewith.* I understand that all submissions of Music, Photos, Recordings, or other materials become property of Producer and will not be returned to me. . . (italics added)

30.     Relying on Pee Wee's status as a co-founder and legacy member of the 12 O'Clock Boys group, his written release and license of rights in the Home Video recording he delivered, and his verbal representation that "you can use the tape" in the Documentary, Lotfy selected 112 seconds of the Home Video provided by Pee Wee (the "Home Video Excerpt") and incorporated it into the Documentary that was released by Oscilloscope, transforming it in the process.

31.     The Home Video Excerpt was introduced into the Documentary by the voiceover narrative of Pug explaining the impact that watching the Home Video had on him.   As the camera transitions from a video close-up of Pug sitting on a stoop to the actual Home Video Excerpt, you hear Pug's benedictory voiceover continue into the beginning of the Home Video Excerpt (with a simultaneous printed overlay of his words), as follows:

> *There was this tape I used to watch when I was little.*
>
> *I used to watch it with Tibba.*
>
> *It was made by the legends.*
>
> *The Founders.*
>
> *The 12 O'Clock Boys.*

32.     The juxtaposition of Pug and the Home Video Excerpt, and the transitioning introductory Pug narrative, transforms the Home Video from a simple home video recording of the daredevil antics of the original, legacy members (or "Legends") made at the time for their own use and entertainment, to a piece of historical propaganda that bridges the connection between legends of the past and young boy who has dreams of someday joining their pantheon.

33.     Indeed, Pug's reference to watching the Home Video with his now dead brother Tibba further transforms the Home Video Excerpt into an emotionally unbreakable bond between the two siblings that transcends Tibba's death.   It converts the Home Video from a pure piece of mindless entertainment to a painful reminder of the tragedy that continues to haunt its protagonist, Pug.

34.     The use of the Home Video Excerpt in this manner in the Documentary thus transforms its purpose, character, meaning and message.

35.   Lotfy registered the copyright to the completed Documentary under the name of his company, Red Gap Film Group LLC, on September 6, 2013, bearing Copyright Registration No. PAu0033699143.

**C.   Oscilloscope Distributes the Documentary**.

36.   Oscilloscope became the exclusive worldwide distributor of the Documentary in 2013, having exclusively licensed those rights from Red Gap Film Group LLC ("Red Gap").

37.   Oscilloscope immediately began distributing the Documentary through various licensees and/or distributors both within the United States and internationally, including SONY, Amazon, Vimeo, Google, YouTube, InDemand, Netflix, Transmission Films and Fandor.

38.   Oscilloscope distributed, marketed and advertised the Documentary since 2013 under the title "12 O'Clock Boys".  It has continued to exploit the Documentary in interstate commerce under that title to the present date.

**Defendants' Trademark Take Down Notices**.

39.   Between November 11, 2017 and December 17, 2017, Defendant Deafueh sent numerous takedown notices (the "Notices") to Oscilloscope's licensees, sub-licensees and distribution partners relating to Documentary, including Notices to Transmission Films, Sony, Vimeo, Baker & Taylor (Target), Chassy Media, YouTube, Google, Beamafilm, Towson University Library and InDemand (hereinafter the "Licensees").

40.   Defendant Deafueh's Notices were written on letterhead with the heading "12 O'Clock Boyz The Official 12 O'Clock Boyz," and were signed by Defendant Deafueh, threatening claims of trademark infringement against the Licensees based upon the marketing and advertisement of the Documentary under the title "12 O'CLOCK BOYS."

41.    Defendant Deafueh asserted that he and Taje owned the mark "12 O'CLOCK BOYZ" and that their purported trademark rights were based upon four federal trademark registrations issued to Defendants for the mark 12 O'CLOCK BOYZ between July 2016 and November 2017, years after Oscilloscope released the Documentary.

42.    Two of the registrations (logo + word mark) were issued on April 29, 2016 and August 16, 2016, respectively, in Class 9 for motion pictures; one registration was issued on July 5, 2016 in Class 41 for movie filming and numerous "entertainment" services and one registration was issued on November 21, 2017 in Class 25 for clothing (the "Trademark Registrations"). All of the Trademark Registrations were "Actual Use" applications under 15 U.S. Code § 1051, subd. 1(a).

43.    When applying for the Trademark Registrations, Defendants represented, under oath pursuant to under 18 U.S.C. §1001, that they began using the Mark "12 O'CLOCK BOYZ" in interstate commerce as of June 25, 2001 in three classes of goods/services (Classes 9, 25 and 41), including through the sale of the Home Video.

44.    The trademark applications were filed by Defendant Deafueh more than two years after Oscilloscope first published and distributed the Documentary under the title "12 O'CLOCK BOYS."

45.    Because of Oscilloscope's continuous marketing and distribution of the Documentary during the past four years, the mark "12 O'CLOCK BOYS" has acquired distinctiveness and would thus qualify as a source-identifying trademark.

46.    The Defendants have never sold, marketed or exploited the Home Video in interstate commerce, or otherwise used the name "12 O'CLOCK BOYZ" on or in connection

with any products or services that were sold, marketed, published or distributed in interstate commerce, including those goods or services identified in the Trademark Registrations.

**D.  Defendants' Copyright Take Down Notices**.

47.    Oscilloscope is aware of several "take down" notices sent by Defendants to Oscilloscope's Licensees pursuant to §512 of the Digital Millennium Copyright Act, 17 U.S.C. §§ 101 *et seq*., and Title II of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, which included an express or implied representation that the statements contained therein were made in good faith.  These DMCA Notices were sent to Chassy Media, Amazon, Towson University Library, Fandor, YouTube and Netflix.

48.    These DMCA Notices included Deafueh's representation that the sole basis for the copyright claim was a 2001 copyright registration bearing the registration number PAu 002610236 that was issued on August 24, 2001 to Taje Monbo and Danielle Avent, as copyright co-claimants, listing Taje as the sole author (the "Copyright Registration").

49.    Defendant Deafueh is not a registered owner of the Copyright Registration for the Home Video.

**E.  Oscilloscope's Counter-Notices**.

50.    On December 6 and 18, 2017, Oscilloscope, through counsel, sent each of the Licensees counter-notification letters pursuant to 17 USC 512(g)(3) (the "Counter-Notices"), stating in substance that Defendant Deafueh's claim of copyright violations was based on mistaken information, misidentification of the material in question, or deliberate misreading of the law.

51.    The Counter-Notices also addressed and refuted the claims by Defendant Deafueh that were based upon the existence of a protectable federal trademark in the mark "12 O'CLOCK

10

BOYZ" and also asserting that Deafueh had not procured valid trademark registrations for that mark.

52. In response to the Notices sent by Deafueh, some of the Licensees removed the Documentary from their websites and/or from distribution.

53. All Licensees have invoked or will invoke their right to seek indemnification from Oscilloscope based upon the Notices.

54. On December 14, 2017, counsel for Oscilloscope sent Defendant Deafueh a letter addressing the Notices and contesting any and all claims based on the existence of, and his purported ownership in, both a protectable federal trademark in the mark "12 O'CLOCK BOYZ" and Taje's and Ms. Avent's exclusive rights in and to the copyright in the Home Video, and otherwise challenging each factual and legal claim asserted in the Notices.

55. The letter demanded that Defendant Deafueh cease all interfering activity and refrain from all further interfering activity in the future.

56. Two days later, on December 17, 2017, Defendant Deafueh sent another DMCA take down notice to another Oscilloscope Licensee, Our Film Festival, Inc. d/b/a Fandor, asserting claims of both trademark and copyright infringement.

57. On December 18, 2017, Fandor sent Plaintiff Oscilloscope notice that it was complying with Defendant Deafueh's Notice and had removed the Documentary from distribution, thereby causing Oscilloscope further damages.

## FIRST CLAIM FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT
### (Oscilloscope Has Not Infringed a Copyright in the Home Video – License)

58. Plaintiff incorporates herein by reference in their entirety the allegations set forth in the paragraphs 1 through 57 of this Complaint as if fully restated herein.

59. In or about 2012, Red Gap Films LLC ("Red Gap") received a written perpetual license from Michael "Pee Wee" Whitaker, Jr. ("Pee Wee"), one of the legacies and founders of the 12 O'Clock Boys group, to use any and all "Recordings", including without limitation, the Home Video, that were delivered by Pee Wee to Red Gap for use in the Documentary.

60. Upon information and belief, Pee Wee is a co-author and/or co-owner of the Home Video and, as such, was authorized to grant Red Gap such license.

61. Red Gap, through its principal, Lotfy Nathan, also received an oral implied license from Pee Wee to use the Home Video in the Documentary, when Pee Wee hand delivered a copy of the Home Video to Lotfy Nathan and told him he could use the portions of the Home Video in the Documentary.

62. As a result, thereof, Red Gap had, at a minimum, a non-exclusive license to use the 112-second Home Video Excerpt in the Documentary.

63. As the exclusive licensee of Red Gap for the distribution rights to the Documentary, Oscilloscope stands in the shoes of Red Gap.

64. As a result, Oscilloscope has a valid license to the Home Video Excerpt, and therefore cannot have infringed the copyrights in the Home Video.

65. There is an actual and justiciable controversy between Oscilloscope and Defendants in that Oscilloscope: (1) disputes that Deafueh has any ownership interest in the copyrights in the Home Video; (2) disputes that Taje and Danielle Avent are the exclusive owners of the copyrights in the Home Video, including Copyright Registration No. PAu 002610236; (3) disputes that Taje is the sole author of the Home Video; (4) disputes the authorship and ownership claim of Taje and Danielle Avent, as memorialized in the Copyright Registration, in that they improperly excluded other putative co-authors and co-owners,

including Michael "Pee Wee" Whitaker, Jr.; and (5) contend that Red Gap and Oscilloscope have a valid license for the use of the Home Video Excerpt as part of the Documentary through the written and verbal licenses granted to it by Michael "Pee Wee" Whitaker, Jr.

66.    A judicial declaration of the parties' respective rights and obligations with respect to the copyright in the Home Video and the validity of the license for the use of The Home Video Excerpt, as alleged herein, is necessary and appropriate.

67.    Oscilloscope seeks judgment declaring the parties respective rights to the ownership and use of the Home Video Excerpt, including (1) that Defendants, or either of them, do not have an exclusive ownership interest in the copyright to the Home Video sufficient to confer standing on them, or either of them, to pursue claims for infringement of the Hone Video Excerpt used in the Documentary; (2) that any ownership that Taje and/or Danielle Avent may have in the Home Video and/or its copyright is non-exclusive and does not pose any bar to licenses granted by Michael "Pee Wee" Whitaker, Jr. in the Home Video to Red Gap Films LLC; and (3) that the written and verbal licenses granted by Michael "Pee Wee" Whitaker, Jr. to Red Gap and/or Lotfy Nathan are valid and absolutely and completely protect Oscilloscope and all of Oscilloscope's Licensees from any liability for copyright infringement based upon the inclusion of the Home Video Excerpt in the Documentary.

**SECOND CLAIM FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT**
**(Oscilloscope Has Not Infringed the Copyright in 12 O'Clock Boyz**
**Based upon the Doctrine of Fair Use)**

68.    Plaintiff incorporates herein by reference in their entirety the allegations set forth in the paragraphs 1 through 67 of this Complaint as if fully restated herein.

69.    The use of the 112-second Home Video Excerpt in the Documentary is protected by the First Amendment to the United States Constitution under the Doctrine of Fair Use.

70. There is an actual and justiciable controversy between Plaintiff Oscilloscope and Defendants as to whether the use of the Home Video Excerpt is protected by the Doctrine of Fair Use.

71. Oscilloscope contends that: (1) the purpose and character of the 112-second Home Video Excerpt has been transformed through its incorporation into the Documentary by adding new expression or meaning to it in a way that did not exist before; (2) the Documentary, which is a polished, edited long-from documentary film whose story line is centered around the character "Pug" as it follows the ups and down of the youngster's life as he works toward his dream of someday becoming a 12 O' Clock Boy, with their ritualistic, albeit illegal, antics and police-baiting wheelies, despite his mother's well-reasoned objections; it is markedly different and distinguishable from the Home Video, which is roughly an hour long series of random footage taken by various people associated with the 12 O'Clock Boys group of dirt bike riders, which glorifies the unlawful practices of the group; (3) that the 112-second Home Video Excerpt is a *de minimis* taking; and (4) there was no negative effect on the potential market for or value of the Home Video caused by the use of the Home Video Excerpt in the Documentary.

72. A judicial declaration of the parties' respective rights and obligations in light of the Fair Use defense is necessary and appropriate.

73. As an alternative claim, Oscilloscope seeks judgment declaring the parties' respective rights to the ownership and lawful use of the Home Video Excerpt, including that the Fair Use defense, bars any and all claims for copyright infringement by either Defendant or any other non-party.

## THIRD CLAIM FOR DECLARATORY JUDGMENT
### (Cancellation of Defendants' Trademark Registrations for the Mark 12 O'Clock Boyz)

74. Plaintiff incorporates herein by reference in their entirety the allegations set forth in the paragraphs 1 through 73 of this Complaint as if fully restated herein.

75. Defendants are the owners of the following United States Trademark Registrations (collectively, the "Trademark Registrations"):

| Mark | Reg No. | Goods and Services/Class |
|---|---|---|
| 12 O'CLOCK BOYZ (word mark) | 4,991,835 | International Class 9 for "Motion Pictures, all featuring documentaries on Baltimore's dirt bike street riders who ride dirt bikes on the city streets of Baltimore, where riders pop wheelies, and elevate the front of their bikes and ride only on the back wheels until the bikes are perpendicular to the road or in the '12 O'Clock' position; digital recordings namely, DVDs, Video Discs, and Videocassettes, all featuring documentaries, where riders pop wheelies, and elevate the front of their bikes and ride only on the back wheels until the bikes are perpendicular to the road or in the '12 O'Clock' position." |
|  (words + logo) | 5,021,939 | International Class 9 for "Motion Pictures, all featuring documentaries on Baltimore's dirt bike street riders who ride dirt bikes on the city streets of Baltimore, where riders pop wheelies, and elevate the front of their bikes and ride only on the back wheels until the bikes are perpendicular to the road or in the '12 O'Clock' position; digital recordings namely, DVDs, Video Discs, and Videocassettes, all featuring documentaries, where riders pop wheelies, and elevate the front of their bikes and ride only on the back wheels until the bikes are perpendicular to the road or in the '12 O'Clock' position." |
|  (words + logo) | 5,338,490 | International Class 25 for "Clothing, namely, t-shirts." |
| 12 O'CLOCK BOYZ (word mark) | 4,991,753 | International Class 41 for "Movie filming services, including movie filming services associated with Baltimore's dirt bike street riders who ride dirt bikes on the city streets of Baltimore, where riders pop wheelies, and elevate the front of their bikes and ride only on the back wheels until their bikes are perpendicular to the road or in the '12 O'Clock'" position" as well as various "Entertainment services" relating to dirt bike riding. |

76. The Defendants' Trademark Registrations were procured by Defendants through false and fraudulent statements, as more fully alleged herein.

77. Defendants' have no legitimate basis to claim that they have used the Defendants' Mark in interstate commerce since June 25, 2001, or that no other person, firm, corporation, or association has the right to use the Defendants' Mark in commerce.

78. The name "12 O'Clock Boys" is merely descriptive of a group of urban, dirt bike riders in Baltimore, and describes one of the stunts they perform. As such, it does not and cannot function as a source identifier for Defendants.

79. The representations made by Defendants in their trademark applications for the Defendants' Mark which resulted in the issuance of the Trademark Registrations were patently false, and made with the knowledge of their falsity, and thus constitute a fraud on the USPTO.

80. The specimens submitted by Defendants in support of the Class 9 trademark application reveals that any claim of actual use in commerce is suspect on its face and, indeed, fraudulent.

81. For example, the initial specimens submitted were merely a photocopy of the drawing "12 O'CLOCK BOYZ", a clear indication that Defendants had not actually used the mark 12 O'CLOCK BOYZ on or in connection with a movie.

82. Following the trademark examiner's initial rejection of that specimen as insufficient to show actual use in commerce, Defendants compounded the fraud by submitting a substitute specimen consisting of a mock-up of a videocassette cover sleeve, and not actual packaging or screen shots of a movie that had been distributed in interstate commerce.

83. Indeed, since no such movie was ever marketed or distributed in interstate commerce, the substitute specimen and representations as to use in interstate commerce constituted a further violation of Section 38 of the Lanham Act, 15 U.S.C. §1120.

84. The total absence of any indicators that the Home Movie 12 O'CLOCK BOYZ was ever released or made available for sale or rental demonstrates that the mark 12 O'CLOCK BOYZ was not in use on any goods in interstate commerce on June 25, 2001, as Defendants had represented on October 3, 2015 when they submitted their Class 9 application, thereby constituting *prima facie* fraud under Section 14(3) of the Trademark Act, 15 U.S.C. §1064(3).

85. Oscilloscope believes that it will be damaged by Trademark Registration Nos. 4,991,835, 5,021,939 5,338,490 and 4,991,753 of 12 O'CLOCK BOYZ in Classes 9, 25 and 41 owned by Defendants, and seeks a judgment, pursuant to 15 U.S.C. §1119, directing the Commissioner of Patents and Trademarks to cancel the Trademark Registrations on the grounds that they were fraudulently procured pursuant to Section 14(3) of the Trademark Act ("Lanham Act"), 15 U.S.C. § 1064(3), or were abandoned, pursuant to 15 U.S.C. § 1127.

86. Oscilloscope claims a date of first use of the mark "12 O'CLOCK BOYS" in Class 9 goods on March 26, 2013.

87. Oscilloscope's mark "12 O'CLOCK BOYS" ("Oscilloscope's Mark") is inherently distinctive as used in connection with Class 9 motion pictures.

88. Oscilloscope's Mark has been used in interstate commerce in connection with motion pictures (*i.e.,* the marketing, advertising and distribution of the Documentary) for over four years, while Defendants have never used their mark "12 O'CLOCK BOYZ" on any goods or services in interstate commerce.

89.     Because of Oscilloscope's widespread and long standing use of Oscilloscope's Mark "12 O'CLOCK BOYS" in connection with motion pictures, Oscilloscope's Mark has acquired distinctiveness and goodwill, and is well known and recognized by consumers and the trade as identifying that the Documentary that is affiliated with or has been authorized by Oscilloscope.

90.     More than two years after the nationwide release of the Documentary, Defendants filed their applications knowing that Oscilloscope had been using the mark 12 O'CLOCK BOYS since 2013, with the intent and purpose of trading and capitalizing on the success of the Documentary.

91.     The goods and services identified in Defendants' Trademark Registrations are closely related to Oscilloscope's goods.

92.     Defendants' use of Defendants' Mark 12 O'CLOCK BOYZ in connection with motion pictures, and entertainment services related to motion pictures and entertainment services dealing with urban dirt bike riding, is likely to cause confusion, mistake or deception as to the source of origin of Oscilloscope's goods in that the public, the trade and others are likely to believe that Defendants' goods and services are provided by, sponsored by, approved by, licensed by, affiliated with or in some other way legitimately connected to Oscilloscope.

93.     Moreover, the continued existence of Defendants' Trademark Registrations casts a cloud upon Oscilloscope's right to continue to use and to expand the use of its Mark 12 O'CLOCK BOYS.

94.     As an alternative argument, assuming *arguendo* that Defendants have ever used the Defendants' Mark in interstate commerce (and Plaintiff contends they have not), they have

abandoned their Mark 12 O'CLOCK BOYZ in that they have discontinued use of that mark with intent not to resume such use.

95. The Declaratory Judgment Act, 28 U.S.C. §§ 2201, <u>et seq</u>., authorizes this Court to declare the rights and legal relations of parties to an active controversy under its jurisdiction.

96. There is an actual, present and existing dispute between the parties concerning the Defendants' rights in and to the Defendants Mark 12 O'CLOCK BOYZ, and Oscilloscope's rights in and to the mark 12 O'CLOCK BOYS.

97. The Court's determination of the issues presented herein would be final and conclusive, insofar as the declaratory judgment sought by Oscilloscope would fully and finally resolve the parties' disputes concerning these trademarks and Defendants' Trademark Registrations.

98. Oscilloscope respectfully requests a judgment declaring that Defendants' Trademark Registrations be cancelled and directing the U.S. Patent and Trademark Office to make appropriate entry in the records of the USPTO consistent with such declaratory judgment.

## FOURTH CLAIM FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT
### (Oscilloscope Has Not Infringed the Mark 12 O'Clock Boyz)

99. Plaintiff incorporates herein by reference in their entirety the allegations set forth in the paragraphs 1 through 98 of this Complaint as if fully restated herein.

100. Since 2013, Oscilloscope has been actively using the Mark 12 O'CLOCK BOYS in interstate commerce through the marketing, advertising and distribution of the Documentary.

101. Upon information and belief, Defendants never used the Words or Logo 12 O'CLOCK BOYZ in interstate commerce in any class of goods or services prior to the filing of their four "actual use" applications for the Mark 12 O'CLOCK BOYZ.

102. Thus, Oscilloscope's mark 12 O'CLOCK BOYS is senior to the Defendants' mark 12 O'CLOCK BOYZ.

103. There is an actual and justiciable controversy between Plaintiff Oscilloscope and Defendants in that Defendants claim that they are the owner of the mark 12 O'CLOCK BOYZ and that Oscilloscope's exploitation of the mark 12 O'CLOCK BOYS in connection with the Documentary has violated Defendants' rights as herein alleged.

104. Plaintiff Oscilloscope seeks judgment declaring the parties respective rights to the use of the title 12 O'CLOCK BOYS with respect to the Documentary, including (1) that Defendants' Trademark Registrations for the mark 12 O'CLOCK BOYZ were procured by fraud; and (2) that Oscilloscope is the senior user of the mark 12 O'CLOCK BOYS and that its continuous use of that mark in connection with the marketing, advertising and distribution of the Documentary is not an infringement of Defendants mark 12 O'CLOCK BOYZ.

**FIFTH CLAIM FOR RELIEF**
**(Tortious Interference with Business Relations)**

105. Plaintiff incorporates herein by reference in their entirety the allegations set forth in the paragraphs 1 through 104 of this Complaint as if fully restated herein.

106. Oscilloscope's relationship with its Licensees is the core of Oscilloscope's business. The various licenses it issues to them, such as those relating to the Documentary, are an essential part of Oscilloscope's business and the lifeblood upon which it depends to sustain its business.

107. The aforementioned conduct of Defendants, including without limitation, sending the Notices to Oscilloscope's Licensees and causing the removal of the Documentary from distribution by certain Licensees has interfered with the business relations Oscilloscope has with each of its Licensees, causing them to question the legitimacy of Oscilloscope's rights to

distribute the Documentary and invoke the Licensees' respective rights to demand Oscilloscope indemnify them for any liability arising from the Defendant Deafueh's conduct.

108. As a result, Plaintiff Oscilloscope has been damaged in an amount to be determined at trial, but in no event less than the jurisdictional minimum of this Court.

**WHEREFORE**, Plaintiff Oscilloscope demands judgment as follows:

a. <u>First Claim for Declaratory Judgment</u>: Judgment declaring the parties' respective rights to the ownership and use of the Home Video Excerpt, including (1) that Defendant Deafueh does not have an interest in the copyright to the Home Video sufficient to confer standing on him to pursue claims for infringement of the Excerpt used in the Documentary; (2) that any ownership that Defendant Taje and Danielle Avent may have in the Home Video and/or its copyright is non-exclusive and does not pose any bar to licenses granted by Michael "Pee Wee" Whitaker, Jr. in the Home Video to Red Gap Films LLC; and (3) that the written and verbal licenses granted by Michael "Pee Wee" Whitaker, Jr. to Red Gap Films LLC and/or Lotfy Nathan are valid and absolutely and completely protect Plaintiff Oscilloscope and all of Oscilloscope's Licensees from any liability for copyright infringement based upon the of the Excerpt used in the Documentary;

b. <u>Second Claim for Declaratory Judgment</u>: Judgment declaring the parties' respective rights to the ownership and use of the Home Video, including that the Fair Use defense bars any and all claims for copyright infringement asserted by either Defendant or any other non-party;

c. <u>Third Claim for Declaratory Judgment</u>: Judgment declaring the parties' respective rights to the ownership and use of the title 12 O'CLOCK BOYS with respect to the Documentary, including (1) that Defendants federal registrations of the mark 12 O'CLOCK

BOYZ was procured by fraud upon the USPTO and must be cancelled; and (2) that Plaintiff Oscilloscope is the senior user of the mark 12 O'CLOCK BOYS and that its use in connection with the marketing, advertising and distribution of the Documentary under that title is not an infringement of Defendants' trademark rights;

d.　Fourth Claim for Relief:　Monetary damages from Defendants in an amount to be proved at trial, but in no event less than this Court's jurisdictional minimum, for the tortious interference with Plaintiff Oscilloscope's business relationships with its licensees, plus applicable interest and punitive damages;

e.　On All Claims:　The costs of this action, including costs and reasonable attorney's fees as provided under the relevant statutes, including Titles 15 and 17 of the U.S. Code; and

f.　Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues which are so triable.

Dated: December 22, 2017

MELONI & McCAFFREY
A Professional Corporation

By: _____
　　　Robert S. Meloni
　　　Thomas P. McCaffrey
3 Columbus Circle – 15th Floor
New York, New York 10019
Tel: (212) 520-6090

*Attorneys for Plaintiff Oscilloscope Pictures, Inc.*