UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| OSCILLOSCOPE PICTURES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.:17-cv-07458-MKB-ST |
| v. | ) | |
| | ) | |
| DEAFUEH MONBO AND TAJE MONBO, | ) | |
| both individually and doing business as | ) | |
| 12 O'CLOCK BOYZ, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT DEAFUEH MONBO'S EMERGENCY MOTION TO
VACATE CLERK'S ENTRY OF DEFAULT**

MELONI & McCAFFREY
A Professional Corporation
Robert S. Meloni
Thomas P. McCaffrey
3 Columbus Circle, 15th Floor
New York, New York 10019

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

RELEVANT FACTS .................................................................................................... 2

    A.    Defendants' Concessions ...................................................................... 2

    B.    Defendants' Assertions on "Information and Belief" ............................... 3

    C.    Defendants' Conclusory, Self-Serving and Uncorroborated Allegations ............... 4

    D.    Defendants' Omissions ......................................................................... 7

ARGUMENT .......................................................................................................... 9

    I.    Defendant Taje Monbo Has Waived All Jurisdictional Arguments ........................ 9

    II.    Deafueh Monbo Has Conceded Plaintiff's Original Moving Arguments .............. 9

        A.  There are no Rule 19 Indispensable Parties ....................................... 9

        B.  Service Was Properly Effected Pursuant to This Court's Order .................... 9

        C.  There is Long Arm Jurisdiction Pursuant to CPLR 302(a)(3) ........................ 9

    III    There Are No Substantive Meritorious Defenses ................................................. 10

        A.  Defendants Proffer No Meritorious Defenses to Copyright Fair Use Claim .. 12

        B.  Defendants' Defense to the Copyright License Claim is Facially Deficient .. 13

            (i) Relevant Allegations by Defendants ....................................... 13

            (ii)  Relevant Allegations by Plaintiff ......................................... 14

            (iii) Pee Wee is an Author and Owner of the 2001 Home Video .................. 15

            (iv)  Pee Wee Granted a Valid, Non-Exclusive License ............................... 17

            (v)   Defendants Have No Meritorious Defenses to License Claim .............. 18

        C.  Deafueh Monbo Lacks Standing to Assert a Defense to the Copyright Claim..19

        D.  Defendants' Defense to the Trademark Claims is Facially Insufficient ..........21

        E.  Defendants' Trademark Claims Are Barred By *Dastar* ................................22

i

F. Defendants' Trademark Claims Are Barred By Nominative Fair Use.............25

G.  Defendants' Purported Mark is Merely Descriptive .......................................27

CONCLUSION ................................................................................................................30

## **TABLE OF AUTHORITIES**

**Cases**                                                                                      **Pages**

*Aalmuhammed v. Lee,*
    202 F.3d 1227 (9th Cir. 2000) ...................................................................16

*Abilene Music, Inc. v. Sony Music Entm't, Inc.,*
    *320 F. Supp. 2d 84 (S.D.N.Y. 2003)*...............................................................12

*Agence Fr. Presse v. Morel,*
    769 F. Supp. 2d 295 (S.D.N.Y. 2011)..............................................................25

*Atlantic Mill & Lumber Realty Co. v. Keefer,*
    179 Md. 496, 20 A.2d 178 1941)...............................................................23 n.22

*Authors Guild, Inc. v. HathiTrust,*
    755 F.3d 87 (2d Cir. 2014).............................................................................20

*Beastie Boys v. Monster Energy Co.,*
    66 F.Supp.3d 424 (S.D.N.Y. 2014)...........................................................25-26

*Brown v. Gabbidon*,
    No. 06 CV 8148, 2007 U.S. Dist. LEXIS 35134 (S.D.N.Y. May 14, 2007).............11

*Burrow-Giles Lithographic Co. v. Sarony,*
    *111 U.S. 53, 58, 4 S. Ct. 279, 28 L. Ed. 349 (1884)*...................................16

*Cariou v. Prince*
    714 F.3d 694 (2d Cir. 2013) ..........................................................................12

*Castle Rock Entertainment v. Carol Publ'g Group*
    150 F.3d 132 (2d Cir. 1998) .........................................................................12

*Clark v. Childs,*
    17-CV-4895 (LDH) (SJB), 2017 U.S. Dist. LEXIS 155847
    (E.D.N.Y. Sept. 22, 2017).............................................................................25

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
    539 U.S. 23, 123 S. Ct. 2041, 156 L. Ed. 2d 18 (2003) ...............................24-25

*DiStiso v. Cook,*
    691 F.3d 226 (2d Cir. 2012)) ...................................................................11 n.6

*EMI Catalogue Pshp. v. Hill, Holliday, Connors, Cosmopulos Inc.,*
    228 F.3d 56 (2d Cir. 2000)............................................................................26

*Enron Oil Corp. v. Diakuhara*,
   10 F.3d 90 (2d Cir. 1993) ............................................................................9 n.4

*Feel Better Kids, Inc. v. Kids in Need USA, Inc.*,
   CV-06-0023 (DRH) (AKT), 2012 U.S. Dist. LEXIS 139770
   (E.D.N.Y. Aug. 27, 2012)..............................................................11, 22, 24

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991)........................15, 17

*Financial Information v. Moody's Investors Serv.*,
   No. 81 Civ. 6001 (RLC), 1984 U.S. Dist. LEXIS 20579
   (S.D.N.Y. Jan. 10, 1984)............................................................................12

*Freeplay Music, Inc. v. Cox Radio, Inc.*,
   409 F. Supp. 2d 259 (S.D.N.Y. 2005)..........................................................25

*Garcia v. Google, Inc.*,
   743 F.3d 1258 (9th Cir. 2013) .................................................................16-17

*Gesualdi v. Tapia Trucking, LLC*,
   09 CV 842 (RJD)(RLM), 2009 U.S. Dist. LEXIS 82955
   (E.D.N.Y. Sept. 11 2009)............................................................................11

*Gov't Employees Ins. Co. v. Right Solution Med. Supply, Inc.*,
   12-CV-0908 (MKB) (JO), 2012 U.S. Dist. LEXIS (E.D.N.Y. Dec. 19, 2012) .........10

*In re MBNA Am. Bank, N.A.*,
   340 F. 3d 1328 (Fed. Cir. 2003)...................................................................27

*Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*,
   931 F.2d 1519 (11th Cir. 1991) ...................................................................27

*J & J Snack Foods Corp. v. Nestle USA, Inc.*,
   149 F. Supp. 2d 136 (D.N.J. 2001) ..............................................................27

*Jorgensen v. Epic/Sony Records*,
   351 F.3d 46 (2d Cir. 2003)..............................................................11 n.6, 22

*Kauhsen v. Aventura Motors, Inc.*,
   Civil Action No. 09-4114, 2010 U.S. Dist. LEXIS 55554
   (E.D.N.Y. June 7, 2010))............................................................................10

*LaChapelle v. Fenty*,
   812 F. Supp. 2d 434 (S.D.N.Y. 2011)..........................................................25

*McGowan v. Smith,*
     52 N.Y.2d 268, 437 N.Y.S. 2d 643 (1981) ................................................................10 n.5


*Neirbo Co. v. Bethlehem Shipbuilding Corp.,*
     308 U.S. 165, 168, 60 S. Ct. 153, 84 L. Ed. 167 (1939)........................................8-9

*New Kids on the Block v. News Am. Pub., Inc.,*
     971 F.2d 302 (9th Cir. 1992) ..................................................................................26

*Patterson v. Cnty. of Oneida,*
     375 F.3d 206 (2d Cir. 2004)................................................................................11 n.6

*Rogers v. Grimaldi,*
     875 F.2d 994 (2nd Cir. 1989)...................................................................................29

*Salomon v. 1498 Realty,*
     148 F.R.D. 127 (S.D.N.Y. 1993) .......................................................................11, 13

*S.E.C. v. McNulty,*
     137 F.3d 732 (2d Cir. 1998)......................................................................................11

*Sony Corp. v. Elm State Elecs., Inc.,*
     800 F.2d 317 (2d Cir. 1986).................................................................................10, 12

*Tiffany (NJ) Inc. v. eBay Inc.,*
     600 F.3d 93 (2d Cir. 2010)........................................................................................26

*Todtman, Nachamie, Spizz & Johns, P.C. v. Ashraf,*
     241 F.R.D. 451 (S.D.N.Y. 2007) ........................................................................9 n.4, 13

*Twentieth Century Fox TV v. Empire Distrib.,*
     161 F. Supp. 3d 902 (CD Cal 2016),
     *aff'd,* 875 F.3d 1191 (9th Cir. 2017),
      *rehearing den.* (2018)) ............................................................................................30

*Volkswagenwerk Aktiengesellschaft v. Church,*
     411 F.2d 350 (9th Cir.1969). ....................................................................................26

*WCVB–TV v. Boston Athletic Ass'n,*
     926 F.2d 42 (1st Cir. 1991).......................................................................................26

*Welding Servs. v. Forman,*
     509 F.3d 1351 (11th Cir. 2007) ................................................................................27

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,*
  277 F. Supp. 2d 356 (S.D.N.Y. 2003)......................................................................27

**Statutes**

C.P.L.R. §302 (a)(3) ....................................................................................................10

Fed. R. Civ. P. §19.........................................................................................................9

Fed. R. Civ. P. §56...................................................................................................12 n.3

17 U.S.C. §101.........................................................................................................15, 17

17 U.S.C. §102(a)(4)................................................................................................16, 17

17 U.S.C. §107...............................................................................................................12

17 U.S.C. §201(a) ..........................................................................................................15

17 U.S.C. §501...............................................................................................................19

**Secondary Sources**

Copyright Office, Compendium II of Copyright Office Practices 480.04 (1984)................15

1 Nimmer on Copyright §6.03 (2018) ...............................................................................17

## PRELIMINARY STATEMENT

Plaintiff Oscilloscope Pictures, Inc. submits this supplemental memorandum of law in response to the Supplemental Declarations of Deafueh Monbo and Taje Monbo in Support of their Motion to Vacate Clerk's Entry of Default (hereafter "Dkt. No. 32" and "Dkt. No. 33", respectively, and collectively "Defendants' Declarations") and Defendants' Supplemental Memorandum of Law (Dkt. No. 38). [1] That memorandum's rote recitation of boilerplate law does nothing to salvage the patent and irremediable insufficiencies of Defendants' Declarations. Despite their generous response schedule and the assistance of counsel, Defendants have utterly failed to hit the mark.

First, Defendants concede personal jurisdiction. They do not contest that the email, post-office box and business addresses that were served pursuant to the Court's March 13, 2018 Order [Dkt. No. 13], were their addresses. Dkt. Nos. 32 & 33, *passim*.  Defendant's counsel has conceded that "a willful default will not normally be set aside" while also conceding Defendants' willfulness by admitting that they (1) were "aware" of this action, (2) issued a "combative response" *via* a "brazen Twitter post" as opposed to filing their answers, and (3) that Plaintiff's alternative service pursuant to this Court's Order "was in fact legitimate service."   Dkt. No. 38, pp. 3, 8 - 10.

Second, Defendants' submissions do not alter the outcome of this motion. They consist of legally insufficient, conclusory and self-serving statements whose few relevant allegations are made upon information and belief, and not upon the personal knowledge of the declarant.  They contain no admissible evidence to support any purported meritorious defenses.  Specifically, nothing in Defendants' submissions addresses a meritorious defense to Plaintiff's second claim for a Declaratory Judgment of non-infringement of any copyright based upon the doctrine of fair use.

---

[1] This memorandum of law is accompanied by the Supplemental Declaration of Robert S. Meloni dated July 11, 2018 (hereafter "Meloni Supp'l Dec.").

Finally, Defendants have offered no viable meritorious defenses based upon their purported trademark, which, as alleged in the Complaint and demonstrated herein, is facially invalid.   As a result, there is no basis for the Court to vacate Defendants' default.

## RELEVANT FACTS

### A.    Defendants' Concessions.

Deafueh Monbo, by her supplemental submissions, concedes the following relevant facts.

1. In 2001, the 12 O'Clock Boyz were a tight knit group of between 10 and 16 dirt bike stunt performers and entertainers located in the city of Baltimore Maryland.  Dkt. No. 32, ¶3.

2. Taje Monbo is a founding member of the 12 O'Clock Boyz.  Dkt. No. 33, ¶¶6-7.

3. Michael "Pee Wee" Whitaker, is a long time friend of Taje Monbo and an original member of the 12 O'Clock Boyz. Dkt. No. 32, ¶17; Dkt. No. 33, ¶9.

4. Taje Monbo has intimate knowledge of the facts and circumstances surrounding the 12 O'Clock Boyz films, sound recordings, merchandise and other artistic works.  Dkt. No. 33, ¶6.

5. The 2001 documentary showcased the exploits of the 12 O'Clock Boyz. Dkt. No. 32, ¶5.

6.  Michael "Pee Wee" Whitaker worked with Taje Monbo on the production of the 2003 Paparazzi Edition. Dkt. No. 33, ¶9.

7.  The majority of the riders depicted in Plaintiff's film are not 12 O'Clock Boyz.  Dkt. No. 33, ¶14.

8.  Mr. Lotfy [Nathan] interviews the leader of the Wild Out Wheelie Boyz and said individual identifies himself as a Wild Out Wheelie Boy, not a 12 O'Clock Boy. Dkt. No. 32, ¶23.

9.  Plaintiff's film used footage including the title card from the 2001 film. Dkt. No. 33, ¶11.

10.  Deafueh Monbo is Taje Monbo's sister.  Dkt. No. 33, ¶6.

11.  Deafueh and Taje Monbo have worked together with the other members of the 12 O'Clock Boyz to build a recognized brand and community. Dkt. No. 33, ¶13. Def's Mem. p. 2.[2]

12.  The members of 12 O'Clock Boyz continue to build their brand and notoriety to this day.  Dkt. No. 32, ¶5.

13.  Deafueh Monbo has always managed the protection of her and Taje Monbo's rights in the 12 O'Clock Boyz endeavor.  Dkt. No. 33, ¶6.

14.  Deafueh Monbo has handled the filings and enforcement of the 12 O'Clock Boyz intellectual property rights.  Dkt. No. 33, ¶12.

15.  Deafueh Monbo sent the takedown notices at issue in this litigation.  Dkt. No. 33, ¶12.

16.  Deafueh Monbo was aware that Plaintiff had apparently filed a lawsuit from a third-party website.  Dkt. No. 32, ¶10.

18.  The pending Motion to Vacate is Deafueh's motion. Dkt. No. 32, ¶1.

19.  Taje Monbo has not yet filed a Motion to Vacate the Default. Dkt. No. 33, ¶4.

20. Taje Monbo is a co-defendant in this action and has submitted his declaration in support of Deafueh Monbo's Motion to Vacate. Dkt. No. 33, ¶1.

21.  Taje Monbo submits his declaration for the specific purpose of illustrating the Defendants' meritorious defenses to Plaintiff's claims. Dkt. No. 33, ¶2.

22.  Taje and Deafueh Monbo are united in their interest of opposing Plaintiff's claims. Dkt. No. 33, ¶4.

**B.    Defendants' Assertions on "Information and Belief".**

Deafueh Monbo, by her supplemental submissions, makes the following unsupported allegations solely "*upon information and belief*":

---

[2] In fact, Defendants' counsel concedes that "the term 12 O'Clock Boyz identifies not only the riders of this group, but *the creative works produced by the group*" and that it is "the brand *they have built up* to identify themselves." Dkt. No. 38, p. 11.  (italics added).

1.  Lotfy Nathan and Red Gap were aware that several different groups ride in the Baltimore area and the majority of the riders depicted in Plaintiff's film are not 12 O'Clock Boyz. Dkt. No. 33, ¶14; Dkt. No. 38, p. 3. .

2.  The 2001 12 O'Clock Boyz film was the first independent urban dirt bike film sold in the Maryland, Washington DC and Virginia area selling upwards of 50,000 units in two weeks.  Dkt. No. 32, ¶4.

3.  The Red Gap documentary contains and utilizes footage from both the 2001 12 O'Clock Boyz film and the 2003 12 O'Clock Boyz: "The Paparazzi Edition" film. Dkt. No. 32, ¶18.

4.  Lotfy Nathan captured of a number of Baltimore motorcycle performers, however the film misidentifies these individuals in order to capitalize on the notoriety of the 12 O'Clock Boyz and cult status of the 12 O'Clock Boyz 2001 and 2003 films.  Dkt. No. 32, ¶19.

**C.**   **Defendants' Conclusory, Self-Serving and Uncorroborated Allegations**.

Deafueh Monbo proffers the following *conclusory, self-serving and unsupported* allegations and *improper legal arguments*:

1.  Michael "Pee Wee" Whitaker did not have any authority to give verbal or written license to Red Gap, Lotfy Nathan or Oscilloscope Pictures to use the 12 O'Clock Boyz brand and artistic works. Dkt. No. 33, ¶10.

2.  The use of the term 12 O'Clock Boyz and the footage, including the title card, from the 2001 film creates a false impression that Red Gap and Lotfy Nathan's works are endorsed by and affiliated with the 12 O'Clock Boyz.  Dkt. No. 33, ¶10.

3.  The term 12 O'Clock Boyz identifies these originators and many urban dirt bike riders still aspire to be members of the 12 O'Clock Boyz. Dkt. No. 32, ¶7.

4.  The 12 O'Clock Boyz were the originators of urban dirt bike culture in Baltimore; they inspired formation of similar groups like Wild Out Wheelie Boyz and Raise it Up. Dkt. No. 32, ¶6.

5.  Plaintiff improperly tries to cash in on the notoriety of, and build a false association with, the 12 O'Clock Boyz. Dkt. No. 33, ¶13.

6.  This false association dilutes the brand of the 12 O'Clock Boyz and attempts to make generic, that which is an exclusive and proud group of riders who identify and produce works under the 12 O'Clock Boyz brand. Dkt. No. 33, ¶15.

7.  Taje and Deafueh Monbo, as individuals, "are owners and authors of":

(i)  12 O'Clock Boyz - an independent documentary film released in 2001 under the following copyrights - PAu002610236, VA0001982689;

(ii)  12 O'Clock Boyz "The Paparazzi Edition" - an independent documentary film released in 2003 under the following copyrights - PAu003760848, VA0002062926;

(iii)  12 O'Clock Boyz - standard character mark - Serial No. 86777306, 86756470; and

(iv)  12 O'Clock Boyz - design mark - Serial No. 86863708, 87312648.

Dkt. No. 33, ¶5; Dkt. No. 32, ¶2

8.  Taje Monbo served as Director, Producer, Writer, Sound Engineer, and Videographer, in the 12 O'Clock Boyz film series released in 2001 and 2003. Dkt. No. 33, ¶8.

9. The branding and term has been used on apparel and merchandise since the formation of the 12 O'Clock Boyz. Dkt. No. 32, ¶7.

10.  Lotfy Nathan and Red Gap were using footage from the 12 O'Clock Boyz films without Defendants' permission. Dkt. No. 33, ¶12.

11.  Taje and Deafueh Monbo have taken legitimate steps to prevent the dilution of the 12 O'Clock Boyz brand and halt the unauthorized use of the name 12 O'Clock Boyz and artistic works. Dkt. No. 32, ¶8.

12.   Deafueh Monbo was never personally served with the summons and complaint.  Dkt. No. 32, ¶11.[3]

13.   Deafueh Monbo's failure to answer the Complaint was not willful, as she had a good faith belief that the motion she submitted in response to the Complaint was timely. Dkt. No. 32, ¶9.

14.   Deafueh Monbo had no reason to believe that her time to respond to the action had begun to run.  Dkt. No. 32, ¶11.

15. Plaintiff's basis for declaratory relief stems two fold, from a distribution agreement with Red Gap (Lotfy Nathan) and a release and alleged license from Michael "Pee Wee" Whitaker to allow Red Gap and Lotfy Nathan use of only the 2001 film. Dkt. No. 32, ¶16.

16. Michael "Pee Wee" Whitaker, an original member of the 12 O'Clock Boyz, was not an author of the 12 O'Clock Boyz film and had no authority to license the work. Dkt. No. 33, ¶17.

17.   The notion that the term 12 O'Clock Boyz is a generic term is misinformed, false and purposefully misleading. Dkt. No. 32, ¶20.

18.   There is an unfortunate pattern and practice of filmmakers and artists appropriating and monetizing urban culture without permission or attribution, often perpetuating misinformation such as the generalization of specific terms.  Dkt. No. 32, ¶21.

19.   Plaintiff's outrageous proposition, suggesting that basically any urban dirt bike rider in Baltimore is a 12 O'Clock Boy, is self-serving and unsubstantiated.  Dkt. No. 32, ¶21.

20.   Defendants are the owners of a number of 12 O'Clock Boyz properties and have been using the 12 O'Clock Boyz name as an identifier in the production of artistic works and merchandise since 2001. Dkt. No. 32, ¶24.

---

[3] Indeed, Defendant's counsel concedes that Plaintiff's service "was in fact legitimate service." Dkt. No. 38, p. 9

21.  In 2009 Lotfy Nathan, a film maker, copyrighted a series of DVDs under the title The Twelve O'clock Boyz, three years prior to him purportedly receiving permission to use footage from the Defendants' 12 O'Clock Boyz Films from Mr. Whitaker.  Dkt. No. 32, ¶25.

22.  Neither Lotfy Nathan nor Red Gap possess a valid copyright and consequently cannot grant distribution or enforcement rights to Oscilloscope Pictures. Dkt. No. 32, ¶26.

23.  It is patently clear that the Defendants have cognizable rights which should be adjudicated on their merits.  Dkt. No. 32, ¶27.

24.  A meritorious defense exists if based on the defendant's version of events, the fact-finder has some determination to make. Dkt. No. 32, ¶28

25.  It is clear that the Court needs to make a determination regarding the rights of the parties herein, as well as the rights of parties not presently involved in this action. Dkt. No. 32, ¶29.

26.  Vacating the default will not significantly prejudice the Plaintiff.  Dkt. No. 32, ¶30.

27.  The rights and title concerns in the instant proceeding must be resolved for the benefit of all involved parties. Dkt. No. 32, ¶31.

28.  This resolution requires testimony and evidence which have yet to be presented to the Court. Dkt. No. 32, ¶31.

29.  Because of the strong public policy of resolving cases on their merits, the court should vacate the default. Dkt. No. 32, ¶32.

30. There are two independent documentary films concerning the 12 O'Clock Boyz, one released in 2001 and a Paparazzi Edition released in 2003. Dkt. No. 33, ¶5.

**D.  <u>Defendants' Omissions</u>**.

Finally, Defendants make no reference to any meritorious defense to Plaintiff's "fair use" claim, which alleges *inter alia* that the narrative focus of Lotfy Nathan's Documentary is on the

young boy Ty'quan "Pug" Ford, the impact of Pug's watching the 12 O'Clock Boyz' video, his aspirations to ride with their crew, and the dramatic impact on his family of Pug's decision to become a 12 O'Clock Boy. That narrative focus transformed the purpose, character, meaning and message of the short clip so as to provide Plaintiff with an unassailable "fair use" defense. *Compare* Dkt. No. 1, ¶¶31-34, 68-73 *with* Dkt. No. 33,¶¶1-16; Dkt. No. 32, ¶¶1-33. Indeed, Defendants concede this transformative aspect of Plaintiff's film when they state in their Memorandum that "[t]he notoriety gained by the actions of the 12 O'Clock Boyz and the pervasiveness of the Defendants' 2001 film inspired many young riders to try to attempt to earn a place within the group." Dkt. No. 38, p. 11 (italics added).

## ARGUMENT

### I.   Defendant Taje Monbo Has Waived All Jurisdictional Arguments.

Taje Monbo's submission of his declaration on his sister's motion to vacate the default without reserving his own jurisdictional defenses constitutes waiver and submission to the jurisdiction of this Court. He identifies himself as a "co-defendant", states that he "makes this declaration for the specific purpose of illustrating *Defendants*' meritorious defenses to Plaintiff's claims" and states that he and his sister are "united in the interest of defending against plaintiff's claims." Dkt. 33, ¶¶1, 2 and 4.  However, he does not reserve his right to present any defense based on insufficient service or personal jurisdiction.  *See* Dkt. 33, *passim*.  By intervening to protect both his and his sister's substantive rights and in support of his sister's affirmative relief of vacatur, without preserving any service or jurisdictional defenses, constitutes waiver thereof. *See Neirbo Co. v. Bethlehem Shipbuilding Corp.,* 308 U.S. 165, 168, 60 S. Ct. 153, 84 L. Ed. 167 (1939) ("[L]ack of personal jurisdiction is a privileged defense that can be waived 'by failure to assert it seasonably, by formal submission in a cause, or by submission through conduct'").

## II.  Deafueh Monbo Has Conceded Plaintiff's Original Moving Arguments.[4]

### A.  There Are No Rule 19 Indispensable Parties.

Defendants' argument that 12 O'Clock Boyz Sports, Inc. is an indispensable party should be entirely disregarded since Defendants concede that they are the only "owners and authors" of the intellectual property at issue.  *See* Dkt. No. 33, ¶5; Dkt No. 32, ¶2.  Thus, the only alleged "owners and authors necessary to resolve any issues concerning the copyrights are before this Court.

### B.   Service Was Properly Effected Pursuant to This Court's Order.

While Deafueh improperly asserts the legal conclusion that she was not personally served, and Taje has waived any such argument, neither Deafueh nor Taje contest the fact that the email address, P.O. Box, business and/or residential addresses at which personal service was effected pursuant to this Court's March 13, 2018 Order [Dkt. No. 13] were not theirs or that they did not receive the pleadings at those locations. *See* Dkt. Nos. 32 & 33, *passim*. As their legal counsel concedes, it "was, in fact, legitimate service. Dkt. No. 38, p. 9.

### C.  There is Long Arm Jurisdiction Pursuant to CPLR 302(a)(3).

Defendants' Declarations or Memorandum do not contest the fact that: (1) they committed tortious conduct outside of New York State in sending out the letters to Plaintiff's distributors which caused injury to Plaintiff within the state, and (2) they had contact with at least two of Plaintiff's distributors within the State of New York.  *See* Dkt. Nos. 32, 33, 38, *passim.*  Moreover, Defendants admit, at least for purposes of jurisdiction, that they sold 50,000 copies of the 2001 12 O'Clock

---

[4] Deafueh's conclusory, self-serving denial of willfulness, given her admission that she was aware of the lawsuit and her failure to deny the existence of Defendants' disrespectful twitter rants against the legal process ("YEAH. YEAH, THROW YOUR LAWSUIT ON THE GRASS AND LEAVE IT THERE."), is not absolved by her *pro se* status, particularly where, as here, she also sought out legal advice from a Maryland attorney.  *See Todtman, Nachamie, Spizz & Johns, P.C. v. Ashraf*, 241 F.R.D. 451, 456 (S.D.N.Y. 2007) (defendant's default found willful, Court stated "[p]arties appearing pro se should be given some leeway in meeting procedural rules due to their lack of legal knowledge, (*citing Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993)), but a reasonable non-lawyer should have realized that some sort of response to the summons and complaint was necessary."). *See also* Dkt. No. 32, ¶¶9-12; Dkt. No. 38, pp. 8-10.

Boyz film in interstate commerce in the Maryland, Washington DC and Virginia area.  Dkt. No. 32, ¶4, Dkt. No. 38, p. 2.  As a result, they concede all elements necessary to invoke long arm jurisdiction under CPLR 302(a) (3).[5]

## III.  There Are No Substantive Meritorious Defenses.

A defendant seeking to prevent entry of a default judgment must present some evidence beyond conclusory denials to support his meritorious defense. *See Sony Corp. v. Elm State Elecs., Inc.*, 800 F.2d 317, 320-21 (2d Cir. 1986) ("Although in an answer general denials normally are enough to raise a meritorious defense, the moving party on a motion to reopen a default must support its general denials with some underlying facts.").  *See Gov't Employees Ins. Co. v. Right Solution Med. Supply, Inc.,* 12-CV-0908 (MKB) (JO), 2012 U.S. Dist. LEXIS 179621 *14-15 (E.D.N.Y. Dec. 19, 2012) ("As evidence of a meritorious defense, Klikshteyn denies that he or Right Solution engaged in 'any wrongdoing . . . with respect to any of the matters in the Complaint,' and swears that he and Right Solution 'adhered' to the "relevant guidelines for markups of pricing of Durable Medical Equipment and supplies.[ ] Such conclusory and self-serving denials of liability, even in the form of an affidavit, do not constitute anything approaching 'credible evidence of facts 'which directly relate[ ] . . . to the allegations [in the complaint] and raise[ ] a serious question as to the validity of those allegations.'"); *Kauhsen v. Aventura Motors, Inc.,* Civil Action No. 09-4114, 2010 U.S. Dist. LEXIS 55554 *15 (E.D.N.Y. June 7, 2010) (Court castigated defendant's counsel for its "bald legal conclusions" and "absence of facts or information beyond conclusory assertions" in support of a meritorious defense); *Gesualdi v. Tapia Trucking, LLC,* 09 CV 842 (RJD)(RLM), 2009 U.S. Dist. LEXIS 82955 (E.D.N.Y. Sept. 11 2009) (defendant seeking to vacate default must

---

[5] *See McGowan v. Smith*, 52 N.Y2d 268, 274, 437 N.Y.S. 2d 643 (1981). Under CPLR 302(a) (3), a non-domiciliary like Defendant who "'commits a tortious act without the state causing injury within the state" may be brought before a New York court to answer for his conduct if he has had sufficient economic contact with the State or an active interest in interstate or international commerce coupled with a reasonable expectation that the tortious conduct in question could have consequences within the State."

provide evidence beyond conclusory denials to support its defense). Indeed, without the prospect of a valid defense, "there is little point in setting aside the default judgment." *Brown v. Gabbidon*, No. 06 Civ. 8148, 2007 U.S. Dist. LEXIS 35134 (S.D.N.Y. May 14, 2007).

Thus, the movant must "articulate a defense with a degree of specificity which directly relates that defense to the allegations set forth in plaintiff's pleadings and raises a serious question as to the validity of those allegations." *Salomon v. 1498 Realty*, 148 F.R.D. 127, 130 (S.D.N.Y. 1993). The test of such defense is measured not by whether there is a likelihood that it will carry the day, but whether the evidence submitted, if proven at trial, would constitute a *complete defense*. *See S.E.C. v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998) (italics added).  Moreover, the allegations supporting a meritorious defense must be made by someone with "personal knowledge" in order to constitute "evidence of facts" sufficient to vacate a default. *Feel Better Kids, Inc. v. Kids in Need USA, Inc.,* CV-06-0023 (DRH) (AKT), 2012 U.S. Dist. LEXIS 139770 *21-22 (E.D.N.Y. Aug. 27, 2012) (*citing McNulty*).[6]

Towards that end, beyond some factual admissions that only undermine their position (*see infra*, pp. 2-4), Defendants' Declarations consist of improper allegations made upon information and belief and not on personal knowledge, or unsupported, conclusory and self-serving allegations of fact and improper legal arguments (*see infra*, pp. 4-7).  As a result, Defendant Deafueh Monbo has failed to carry her burden of presenting meritorious defenses.  *See Sony Corp. v. Elm State Elecs, Inc*., 800 F.2d 317, 320-21 (2d Cir. 1986).

---

[6] *See generally, DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"); *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (Rule 56's "requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'"); *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 57 n. 8 (2d Cir. 2003) (declaration stating "upon information and belief" not "admissible evidence" required under Rule 56).

### A.  Defendants Proffer No Meritorious Defenses to Copyright Fair Use Claim.[7]

Section 107 of the Copyright Act of 1976 recognizes fair use as a complete defense to a claim of infringement.[8] 17 U.S.C. §107; *Abilene Music, Inc. v. Sony Music Entm't, Inc.*, 320 F. Supp. 2d 84, 88 (S.D.N.Y. 2003).  *See Financial Information v. Moody's Investors Serv.*, No. 81 Civ. 6001 (RLC), 1984 U.S. Dist. LEXIS 20579, *17 (S.D.N.Y. Jan. 10, 1984) ("Accordingly, I find that the fair use doctrine shields defendant's action and operates as a complete defense to plaintiff's claims under the Copyright Act.").  Nathan's film provides new insight into the notorious urban dirt bike scene in Baltimore, including the 12 O'Clock Boyz, in a way that differs from the rough, grainy, amateurish footage excerpted from the Home Video. It is in the nature of an extended news piece, and tells a story of the riders from inception to 2013, including the cultural context; and it shapes the narrative using a young boy, Ty'quan "Pug" Ford, who aspires to be a 12 O'Clock Boy. It is neither glorifying nor condemning. The Picture also employs *cinéma vérité* or observational cinema techniques to film its subject which contain subtle, yet important, differences from the real-life home video footage. Defendants make no reference to, and provide no evidentiary support for, any meritorious defense to Plaintiff's supporting allegations and determinative fair use defense. The narrative of Nathan's film is focused on the story of Pug, the impact of Pug's watching the 12 O'Clock Boyz video with his now deceased older brother, Pug's

---

[7] The same arguments presented herein apply equally to Defendants' complete failure to address, no less carry Deafueh's burden to present a meritorious defense to Plaintiff's claim for Tortious Interference. *Compare* Dkt. No. 1, ¶¶105-108 *with* Dkt. Nos. 32 & 33, *passim*.

[8] A Fair Use analysis requires consideration of four factors: (1) purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) nature of the copyrighted work; (3) amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. §107. The "ultimate test of fair use ... is whether the copyright law's goal of 'promoting the Progress of Science and useful Arts' . . . would be better served by allowing the use than by preventing it." *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013) (quoting *Castle Rock Entertainment v. Carol Publ'g Group*, 150 F.3d 132, 141 (2d Cir. 1998)). The fair use doctrine is intended to protect secondary works that "add[] value to the original," that use the original work "as raw material, transformed in creation of new information, new aesthetics, new insights and understandings." *Castle Rock*, 150 F.3d at 142.

aspirations to ride with their crew, the dramatic impact on his family of Pug's decision to become a 12 O'Clock Boy, and his family's opposition to Pug becoming a member. It does not glorify the conduct of the 12 O'Clock Boyz, whose antics are, in essence, a criminal act.[9] As such, Nathan's film transformed the purpose, character, meaning and message of the short excerpt in such a way as to provide Plaintiff with an unassailable "fair use" defense.  *Compare* Dkt. No. 1, ¶¶31-34, 68-73 *with* Dkt. No. 33, ¶¶1-16; Dkt. No. 32, ¶¶1-33 and Dkt. No. 38, p. 11. Defendants fail to articulate a meritorious defense with a degree of specificity which directly relates that defense to the allegations set forth in Plaintiff's pleadings and raises a serious question as to the validity of those allegations. *Salomon v. 1498 Realty*, 148 F.R.D. 127, 130 (S.D.N.Y. 1993).  This failure renders any purported meritorious defense to the other claims unavailing for purposes of vacating the default. *See Todtman, Nachamie, Spizz & Johns, P.C. v. Ashraf*, 241 F.R.D. 451, 456 (S.D.N.Y. 2007).

**B.   Defendants' Defense to the Copyright License Claim is Facially Insufficient.**

**(i)     Relevant Allegations by Defendants.**

With respect to this claim, Defendants concede the following facts:

1.  In 2001, the 12 O'Clock Boyz were a tight knit group of between 10 and 16 dirt bike stunt performers and entertainers located in the city of Baltimore Maryland.  Dkt. No. 32, ¶3.

2.  Taje Monbo is a founding member of the 12 O'Clock Boyz.  Dkt. No. 33, ¶¶6-7.

3.   Michael "Pee Wee" Whitaker, is a long-time friend of Taje Monbo and an original member of the 12 O'Clock Boyz.  Dkt. No. 33, ¶9; Dkt. No. 32, ¶17.

---

[9] *See Baltimore Cops Have Found A New Enemy- Dirt-Bikers* https://theconcourse.deadspin.com/baltimore-cops-have-found-a-new-enemy-dirt-bikers-1729371288, dated 9/10/2015 ("But they've also long been a public-safety concern in the city—in May, a woman died after a dirt bike struck her and its rider fled; in July, a 21-year-old biker was struck by a car and killed—and an ever-intensifying police crackdown has been in effect all summer. Cops use road blockades to prevent riding, conduct heavy surveillance to serve warrants, and even physically chase dirt-bikers through the streets, which contravenes official law-enforcement policy meant to curb accidents.").

4.  Taje Monbo has intimate knowledge of the facts and circumstances surrounding the 12 O'Clock Boyz films, sound recordings, merchandise and other artistic works.  Dkt. No. 33, ¶6.

5.  Plaintiff's film used footage including the title card from the Defendant's 2001 film. Dkt. No. 33, ¶11.

6.  Deafueh and Taje Monbo have worked together with the other members of the 12 O'Clock Boyz to build a recognized brand and community. Dkt. No. 33, ¶13.

7.  The members of 12 O'Clock Boyz continue to build their brand and notoriety to this day. Dkt. No. 32, ¶5; Dkt. No. 38, p. 2

**(ii)   Relevant Allegations by Plaintiff.**

With respect to its license claim, Plaintiff alleged the following facts in its Complaint:

"12 O'Clock Boys" is a term that describes a loosely affiliated group of dirt bike and quad riders, named for the "12 O'Clock" signature trick they pride themselves on, whose ever evolving membership has regularly gathered since the turn of the century to illegally ride *en mass* through the Baltimore Streets, popping wheelies and weaving through vehicle and pedestrian traffic at excessive speeds, while taunting and evading the Baltimore Police.  Dkt. No. 1, ¶9. As Defendants admit, it is not solely about the original "Legends" known as the 12 O'Clock Boyz. Dkt. No. 32, ¶¶19, 23.

Michael "Pee Wee" Whitaker, Jr. ("Pee Wee") is one of the founding members of the 12 O'Clock Boyz.  Dkt. No. 1, ¶10.  Pee Wee, a so called biker "Legend", gave Lotfy Nathan a copy of a 2001 VHS home video styled street tape of the early days of the 12 O'Clock Boyz. *Id*., ¶22. [10]  Pee Wee also appears in the Home Video and performs stunts typical of 12 O'Clock riders. *Id*. ¶24.   In

---

[10] Defendants have failed to produce a copy of either their 2001 or 2003 version of their videos (it is not commercially available anywhere). Such failure should be held against the Defendants. Notwithstanding that failure, however, Plaintiff's analysis is based on the Lotfy Nathan film (a DVD copy is being produced to the court of the complete 75-minute film), and the 112-second excerpt of the 2001 version incorporated therein. Plaintiff's submissions, along with Defendants' failure to submit either of their works, conclusively demonstrates Plaintiff's fair use defense and vindicates Plaintiff.

the Documentary, just before the "title credit" for the Home Video Excerpt appears, Pee Wee can be

heard on a voiceover describing how *they filmed themselves* for the Home Video:

> "Bike life…we started that type thing. If they say anything about bikes in this city, they gonna mention me . . . We took the dirt bike thing, from just lookin' at it as a bike…we took it to a whole 'nuther level. **We had bikes and we were just filmin' ourselves . . .  playing with the camera. And then one day, I just jumped up and was like, we gonna make us a group; we gonna make a tape."**

*See* Meloni Supp'l Dec., Exhibit D, at 15:57 – 16:59.[11]

Finally, when Pee Wee delivered a copy of the Home Video to Nathan, he told Nathan "you

can use the [Home Video] tape" in the Documentary.  Dkt. No. 1, ¶28.[12]

### (iii)    Pee Wee is an Author and Owner of the 2001 Home Video.

Pee Wee, as both performer and videographer, is a co-author of the Home Video under 17

U.S.C. §101 *et seq. Id.* ¶23. Only modest "creativity," or intellectual labor, is required to show

authorship. *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 250, 23 S. Ct. 298, 47 L. Ed.

460 (1903).  Also, ownership of a copyright vests initially in the authors of the work. 17 U.S.C. §

201(a).

An author "in a constitutional sense" is one "to whom anything owes its origin; originator;

maker." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346, 111 S. Ct. 1282, 113 L. Ed.

2d 358 (1991) (*quoting Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58, 4 S. Ct. 279, 28

L. Ed. 349 (1884)).  In other words, the creator of copyrightable artistic expression is an author.

---

[11] In the Nathan Documentary, there is also a 12 O'Clock rider holding a video camera filming nearby riders from a car. *See* Meloni Supp'l Dec., Exhibit D, at 18:06-18:19. The actor in this clip says: "*That's what we do…train 'em (unintelligible)... That's what we do, you can take my bike…get the fuck away... I'm recording him.  He recording me.*"

[12] Defendants do not deny this fact. Dkt. Nos., 32 & 33, *passim*. Indeed, Defendants concede that the members of the group, including Pee Wee, have worked together with Defendants since the beginning to this day to build their brand.  Dkt. No. 32, ¶5; Dkt. No. 33, ¶13. Moreover, with respect to the 2003 Paparazzi Edition, Taje admits that "Pee Wee Whitaker worked with Taje Monbo on the production of the 2003 Paparazzi Edition". Dkt. No. 33, ¶9. That concedes that all the group members, including Pee Wee, contributed to all of their creative decisions and authors of their purported video.

Thus, an actor's performance should be considered copyrightable works of authorship. *See Garcia v. Google, Inc.*, 743 F.3d 1258, 1272-1273 (9th Cir. 2013) ("Under the judicially enhanced joint work requirements," an actress's performance would be "physically inseparable from other cinematic contributions") (*citing Aalmuhammed v. Lee*, 202 F.3d 1227, 1231-36 (9th Cir. 2000)).  In most cases, and certainly in virtually all commercially exploited motion pictures, however, there are at least several, and often large numbers of, collaborators."  *Id.* at 1271 (italics added). Works of choreography and pantomime are potentially works of authorship under current copyright law. 17 U.S.C. 102(a) (4).[13]

The Home Video is an "unedited VHS footage of the group riding around the streets of Baltimore performing individual or group stunts involving acrobatic maneuvering of the motorcycle and rider.  It is interspersed with footage of some of the members talking, of interviews, or shots of people walking around the streets of Baltimore." Dkt No. 1, ¶25. Thus, the only real creative content consists of the riders performing their stunts, or giving interviews.  Pee Wee was one such performer.[14]  He was also one of the videographers who filmed it. *See* Meloni Supp'l Dec., Exhibit G (Pee Wee screen shot) and Exhibit D, at 17:09 (Pee Wee wheelie from Home Video Excerpt), and 15:57 – 16:59 (Pee Wee voiceover).

As a joint author, Pee Wee was also a joint owner of the copyright in the Home Video. Section 201(a) of the Copyright Act provides: "The authors of a joint work are co-owners of

---

[13] The Copyright Office Compendium defines pantomime as "the art of imitating or acting out situations, characters, or some other events with gestures and body movement," which "need not tell a story." Copyright Office, Compendium II of Copyright Office Practices 480.04 (1984), note 181, 460.01, at 400-21.  It defines choreography as "the composition and arrangement of dance movements and patterns[;] … static and kinetic successions of bodily movement in certain rhythmic and spatial relationships," which, like pantomime, "need not tell a story." *Id.*, at 450.01.

[14] The highly stylized and physically difficult stunts performed by riders such as Pee Wee Whitaker are no less creative than a pantomime, dancer or actor who performs stunts like Buster Keaton. The only difference is Pee Wee uses a machine to accomplish his creative feats.  Pee Wee did precisely that for the Home Video and, as such, he was an actor, choreographer and creative contributor for the Home Video. What he added to it is original, expressive movement. Thus, it should be considered copyrightable subject matter, by analogy to pantomime and choreography.

copyright in the work." A "joint work" is defined as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." *See* 1 Nimmer on Copyright §6.03 (2018) (citations omitted) ("a work that is the product of joint authorship, and is thus a joint work,  also means that each contributor automatically acquires an undivided ownership in the entire work, including all of the contributions contained therein"). *See also Garcia v. Google, Inc.*, 743 F.3d 1258, 1263 (9th Cir. 2013) (court found that an actor's performance, when fixed, was copyrightable "if it evinced some minimal degree of creativity…. 'no matter how crude, humble or obvious' it might be.'") (*citing Feist Publ'ns, Inc. v. Rura Tel. Serv.,* 499 U.S. at 345). The Ninth Circuit reasoned that an actor's performance, embodying "body language, facial expression and reactions to other actors and elements of a scene" amounts to copyrightable expression. *Garcia v. Google, Inc.,* 743 F.3d at 1243.   That is true whether the actor speaks, is dubbed over or, like Buster Keaton, performs without any words at all. *Cf.* 17 U.S.C. § 102(a) (4) (noting "pantomimes and choreographic works" are eligible for copyright protection).  It is clear that the stylized, choreographed and staged performances of riders like Pee Wee meet these minimum requirements.[15] Pee Wee's filming it constitutes another type of authorship contribution.

### (iv)     <u>Pee Wee Granted a Valid, Non-Exclusive License.</u>

Pee Wee Whitaker signed a release and transfer of rights which provides in relevant part:

6. "*[I agree] [t]hat if I . . . submit any . . . original audio and/or video recordings ("Recordings") to Producer, I hereby represent and warrant that I own, control or have obtained all rights (including, without limitation, all copyrights) in and to any and all such . . . Recordings, and I hereby grant to Producer, without charge, the rights necessary to use such . . .  Recordings on and in connection with the Picture and the rights required to exploit the Picture and the ancillary rights therein as*

---

[15] The eight enumerated categories in 17 U.S.C. §102, which defines the subject matter of copyrights, is illustrative, not exhaustive, as it states that Works of authorship "include" the eight listed. The definition section of the 1976 Act states that terms such as "including" are "illustrative and not limitative." 17 U.S.C. §101. This suggests that other types of intellectual creations may be eligible for protection as long as they satisfy copyright's originality and fixation requirements.

*described anywhere in this Talent Release (including, without limitation, in advertisements, promotions and publicity), in any and all media now known or hereafter devised, or for any purpose, throughout the universe in perpetuity. I hereby represent and warrant that I have obtained all of the rights, clearances, and releases necessary for Producer to exploit said . . .  Recordings in connection herewith. . . ."* (italics added)

Dkt. No. 1, ¶29; Meloni Supp'l Dec., Exhibit I (Pee Wee "Consent & Release"") (italics added).

Relying on Pee Wee's (now conceded) status as a co-founder and legacy member of the 12 O'Clock Boyz, his written release and license of rights in the Home Video he hand-delivered to Lotfy Nathan, and his verbal representation that "you can use the tape" in the Documentary, Lotfy Nathan selected 112 seconds of the Home Video provided by Pee Wee (the "Home Video Excerpt") and incorporated it into the Documentary (beginning at 16:56), transforming it in the process. *Id*., ¶¶30, 59-61; Meloni Supp'l Dec., Exhibit D. Given these uncontroverted facts, Red Gap, at minimum, obtained a non-exclusive license from a copyright co-owner to use the 112-second Home Video Excerpt in the Documentary. *Id.*, ¶62. As the exclusive licensee of Red Gap for the distribution rights to the Documentary, Oscilloscope stands in the shoes of Red Gap. *Id.*, ¶63. Plaintiff has a valid license to the Home Video Excerpt and cannot have infringed any purported copyrights therein. *Id.*, ¶64.

**(v)    Defendants Have No Meritorious Defense to the License Claim.**

Beyond their concession that (a) Pee Wee was a founding member of the 12 O'Clock Boyz (Dkt. No. 33, ¶9; Dkt. No. 32, ¶17), (b) that since 2001, Defendants have worked together with the other members of the 12 O'Clock Boyz to build a recognized brand and community (Dkt. No. 32, ¶5; Dkt. No. 38, p. 2), (c) that the members of 12 O'Clock Boyz continue to build their brand and notoriety to this day (Dkt. No. 32, ¶5) and (d) that Pee Wee worked with Taje Monbo on the production of the 2003 Paparazzi version of the film (Dkt. No. 33, ¶9), Defendants present no meritorious defense to the license claim. Moreover, Defendants do not contest Plaintiff's allegations

18

that Pee Wee was a performer in the video, that he provided a copy of the VHS Tape of the video to Nathan and told him he could use it in his film, or that Pee Wee signed the written release and assignment. *Compare* Dkt. No. 1, ¶¶9-10, 22-24, 28-30, 59-64 *with* Dkt. Nos. 32, 33 & 38, *passim*.

Instead, Defendants conclusively argue, without factual or legal support, that Pee Wee, one of the original members of the 12 O'Clock Boyz that has worked with Defendants and the other members to build the group's brand and notoriety from 2001 through the present, and concededly worked with Taje on the production of a version of the film (Dkt. No. 33, ¶9),  "was not an author of the 12 O'Clock Boyz film and had no authority to license the work" (Dkt. No. 32, ¶17) and "did not have any authority to give verbal or written license to Red Gap, Lotfy Nathan or Oscilloscope Pictures, to use the 12 O'Clock Boyz brand and artistic works" (Dkt. No. 33, ¶10). Indeed, Defendants' conclusory, one-sentence legal argument on this point is baldly and solely based entirely upon these unsupported averments. Dkt. No. 38, p. 10. Tellingly, despite more than enough time to do so, Defendants fail to provide a supplemental declaration from Pee Wee, Taje's longtime friend and founding member of the 12 O'Clock Boyz, supporting their improper legal conclusion. Defendants' conclusory allegations and bald legal conclusions concerning their exclusive control over the rights in the video do not satisfy their burden to establish a meritorious defense. *See Kauhsen v. Aventura Motors, Inc.*, Civil Action No. 09-4114, 2010 U.S. Dist. LEXIS 55554 *15 (E.D.N.Y. June 7, 2010) (Court castigated defendant's counsel for its "bald legal conclusions" and "absence of facts or information beyond conclusory assertions" in support of a meritorious defense).

**C. Deafueh Monbo Lacks Standing to Assert a Defense to the Copyright Claim.**

The Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf, a status which is reserved to owners of an exclusive right under a copyright. 17 U.S.C. §501.  *See Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 94 (2d Cir. 2014).  The Home

Video Excerpt was taken from the 2001 videocassette version. *See* Dkt. No. 1, ¶48.[16] Both

Defendants' Declarations and their DMCA Notices (Meloni Dec., Ex. A [Dkt. No. 26]) included

their representation that the sole basis for the copyright claim for the 2001 videocassette version

was a 2001 copyright registration bearing the registration number PAu 002610236 that was

issued on August 24, 2001 to Taje Monbo and Danielle Avent, as copyright co-claimants, listing

Taje as the sole author.[17]   Deafueh's similarly only cites to that registration in her Declaration.

Dkt. No. 32, ¶5(i)); Dkt. No. 1, ¶48.[18]   Since Deafueh Monbo is not an owner of the 2001

---

[16] The only registration cited by Defendants for this work is PAu002610236, described as follows:

| | |
|---|---|
| Type of Work: | Motion Picture |
| Registration Number / Date: | PAu002610236 / 2001-08-24 |
| Title: | 12 o'clock boyz. |
| Description: | Videocassette ; 1/2 in. |
| Copyright Claimant: | Taje Monbo, 1975- a.k.a. Moe-Town, pseud.), Danielle Avent |
| Date of Creation: | 2001 |
| Authorship on Application: | motion picture: Taje Monbo. |
| Names: | Monbo, Taje, 1975- Moe-Town, pseud. Avent, Danielle |

*See* Meloni Supp'l Dec., <u>Exhibit A</u>

[17] Taje provides only a single conclusory statement about the nature of his authorship ("I served as Director, Producer, Writer, Sound Engineer, and Videographer, in the 12 O'Clock Boyz film series…") (Dkt. No. 32, ¶8). Despite the fact that the 2001 registration (No. PAu 002610236) lists only Taje as an author, Deafueh still claims to be Taje's co-author of the same 2001 Home Video: "Both I and my brother, Defendant Taje Monbo, are owners, **and authors** of the following properties: (i) 12 O'Clock Boyz - an independent documentary film released in 2001 under the following copyrights - PAu002610236…" (Dkt. No. 32, ¶3). Moreover, she omits any reference to Danielle Avent, who is listed as a co-owner in that registration.

[18] Inexplicably, Deafueh cites to a "Visual Arts" registration (Reg. No. VA0001982689) for something titled "12_o_clock_boyz___visual", where "Authorship" is claimed only for "2-D Artwork", for which she claims co-authorship credit, along with Taje Monbo, and sole ownership. *See* Meloni Supp'l Dec., <u>Exhibit B</u>. A work of "Visual Arts" is limited to the following categories (*and motion pictures is not one of them*):

> "The visual arts category consists of pictorial, graphic, or sculptural works, including two- and three-dimensional works of fine, graphic, and applied art. Examples of such works include photographs; original prints; art reproductions; cartographic works, such as maps, globes, and relief models; technical and mechanical drawings; and architectural drawings, plans, blueprints, or diagrams." https://www.copyright.gov/fls/fl115.html.

Neither Deafueh nor Taje provide any explanation as to what this work consists of, and how it relates to the 2001 work covered by Reg. No. PAu 002610236. It is incontrovertible that it is not a motion picture but, rather, is a 2-D work of "art". Thus, it cannot possibly have any implications here. Moreover, although this registration lists Deafueh as an "Authorship on Application", her Declaration is devoid of any comment about the nature of that authorship. In any event, the work from which the Home Video Excerpt was taken was the 2001 version of a motion picture – the VHS format videocassette provided to Lotfy Nathan by Pee Wee – and not any work of "visual art."

copyright bearing Registration No. PAu 00261023, she has no standing to challenge Plaintiff's claim of non-infringement of copyright, no less the right to send a takedown notice pursuant to the provisions of §512.

### D.   Defendants' Defense to the Trademark Claims is Facially Insufficient.

Plaintiff's Third Claim seeks, *inter alia*, a cancellation of defendants' federal Trademark registrations of the term "12 O'Clock Boyz" as both word and word + logo which Plaintiff alleges was procured by fraud because Defendants' have no legitimate basis to claim that they have used the Defendants' Mark in interstate commerce since June 25, 2001, that no other person, firm, corporation, or association has the right to use the Defendants' Mark in commerce, and that the name "12 O'Clock Boys" is anything more than a mere descriptive term for urban, dirt bike riders in Baltimore who perform a specific stunt with their motorcycles and ATVs.[19] As such, it does not and cannot function as a source identifier for Defendants. *See* Dkt. No. 1, ¶74-98.

Plaintiff's Fourth Claim seeks, *inter alia*, a declaratory judgment that Plaintiff, who has been actively marketing its film in interstate commerce under the title "12 O'Clock Boys" since 2013, is senior to the Defendants' mark "12 O'Clock Boyz", which was not registered until late 2015.  *See* Dkt. No. 1, ¶99-104. Defendants have not and cannot contest those facts.  *See* Dkt. Nos. 32, 33 & 38, *passim*.

In support of their meritorious defense to Plaintiff's two trademark related claims, Defendants allege that they are owners and authors of "12 O'Clock Boyz" standard character mark - Serial Nos. 86777306, 86756470, and design mark - Serial Nos. 86863708, 87312648. Dkt. No. 33,

---

[19] Deafueh declares that she is the owner of two 12 O'Clock Boyz marks (word and design) in Classes 9, 25 and 41. Dkt. N o. 32, ¶5 (iii) and (iv). However, the only registration of any relevance to the trademark non-infringement claim is the word mark in Class 9 (motion pictures), Reg. No. 4,992,835 / Serial No. 86777306.  Defendants make no claim that Plaintiff used their logo, or that there has been any infringement of the marks registered in Class 25 (clothing) or Class 41 (movie filming services).

¶5 (iii), (iv); Dkt. No. 32, ¶2 (iii), (iv); Dkt. No. 38, p. 1-2.[20]  However, their only proffered support against Plaintiff's challenge to their fraudulent claim that they have been exploiting the mark 12 O'Clock Boyz in interstate commerce since 2001 comes from Defendant, Deafueh Monbo, identified by Taje Monbo as the person who "has typically handled the filings and enforcement of the 12 O'Clock Boyz intellectual property rights." Dkt. No. 33, ¶12. Deafueh's only allegation on this issue is as follows:

> "*Upon information and belief*, the 2001 12 O'Clock Boyz film was the first independent urban dirt bike film sold in the Maryland, Washington DC and Virginia area; selling upwards of 50,000 units in two weeks".

Dkt. No. 32, ¶4.   This conclusory allegation based "upon information and belief" does not satisfy the requirement that a meritorious defense must be supported by evidentiary facts based on personal knowledge. *Feel Better Kids, Inc. v. Kids in Need USA, Inc*., CV-06-0023 (DRH) (AKT), 2012 U.S. Dist. LEXIS 139770 *21-22 (E.D.N.Y. Aug. 27, 2012).  *See Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 57 n. 8 (2d Cir. 2003) (a declaration stating "upon information and belief" is not "admissible evidence").

### E.  Defendants' Trademark Claims Are Barred By *Dastar*.

Defendants' sole allegation that Plaintiff used the mark "12 O'Clock Boyz" relates to the incorporation of the 112 seconds of the 2001 home video in Nathan's film *12 O'Clock Boys*:

> "The use of 12 O'Clock Boyz, particularly the use of the footage including the title card from the 2001 film creates a false impression that Red Gap and Lotfy Nathan's works are endorsed by and affiliated with the 12 O'Clock Boyz."

---

[20] Their purported exclusive ownership in the mark "12 O'Clock Boyz" is controverted by their allegations that they and the other members of the group, which includes Pee Wee, have been continuously working together since 2001 to this day to build a recognized brand. *See* Dkt. No. 33, ¶13, Dkt. No. 32, ¶5, Dkt. No. 38, p. 2.

Dkt. No. 33, ¶11.[21]   Other than that, Defendants rely on unsupportable legal conclusions that Plaintiff is trying to improperly cash in on the *group's* (*not the Defendants'*) notoriety to build a false association with the 12 O'Clock Boyz. Dkt. No. 33, ¶13.

The only references to something other than the use of the 2001 video "title card" to support their trademark related claims, are the unsupported allegations "that, *upon information and belief,* Lotfy Nathan and Red Gap were aware that several different groups ride in the Baltimore area and the majority of riders depicted in Plaintiff's film are not 12 O'Clock Boyz." Dkt. No. 33, ¶14. Taje Monbo thereafter summarily recites the bald legal conclusion:

> "This false association dilutes the brand of the 12 O'Clock Boyz and attempts to make generic, that which is an exclusive and proud group of riders who identify and produce works under the 12 O'Clock Boyz brand."

Dkt. No. 33, ¶15. Deafueh also asserts, without personal knowledge, the following allegations:

> "*Upon information and belief*, Mr. Lotfy [Nathan] captured of a number of Baltimore motorcycle performers, however the film misidentifies these individuals in order to capitalize on the notoriety of the 12 O'Clock Boyz and cult status of the 12 O'Clock Boyz 2001 and 2003 films."

Dkt. No. 32, ¶19. However, Deafueh then undercuts her position by stating:

> "This is particularly true in light of the fact that Mr. Lotfy [Nathan] interviews the leader of the Wild Out Wheelie Boyz and said individual identifies himself as a Wild Out Wheelie Boy, not a 12 O'Clock Boy."

Dkt. No. 32, ¶23. Thus, the only trademark related allegations in support of a claimed meritorious defense to Plaintiff's claims of non-infringement of the "12 O'Clock Boyz" purported trademark,

---

[21] The phrase "12 O'Clock Boyz" refers the viewer to 12 O'Clock Boys Inc., the entity which is identified in the "Presents" credit appearing in the Home Video Excerpt: "12 O'Clock Boys Inc. Presents THE OFFICIAL 12 O'CLOCK BOYZ". *See* Meloni Supp'l Dec., Exhibit D, at 17:00-17:08.  12 O'Clock Boys Inc. was a Maryland corporation formed in 2001, which was administratively dissolved in 2002. It is presently inactive.  *See* https://egov.maryland.gov/BusinessExpress/EntitySearch/BusinessInformation/D06356109. Under Maryland law, a dissolved corporation ceases to exist as a legal entity.  *See Atlantic Mill & Lumber Realty Co. v. Keefer,* 179 Md. 496, 499-500, 20 A.2d 178 1941) ("A dissolved corporation has no standing in court or power to make any motion regarding prosecution or disposal of an independent suit against it. After its dissolution, a corporation can maintain no action to enforce rights acquired during the life of its charter.")

beyond the use of the "title card" as part of the Home Video Excerpt incorporated into the film "12 O'Clock Boys", are alleged solely "upon information and belief" and thus not based on defendants' personal knowledge.  That is insufficient.  *See Feel Better Kids, Inc. v. Kids in Need USA, Inc*., CV-06-0023 (DRH) (AKT), 2012 U.S. Dist. LEXIS 139770 *21-22 (E.D.N.Y. Aug. 27, 2012).

Assuming *arguendo*, that Defendants could overcome their challenged inability to offer evidence in support of a meritorious defense that they sold their videos in interstate commerce, then any purported trademark infringement claim based solely upon the incorporation of the 2001 video's "title card" in Plaintiff's film would be barred under the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S. Ct. 2041, 156 L. Ed. 2d 18 (2003). There, the Supreme Court held that the phrase, "origin of goods" or designation of origin under §43(a)(1)(A) refers to the producer of the tangible goods offered for sale, and not the author of any idea, concept or communication embodied in those goods.  *Id*. at 37.

In *Dastar*, the plaintiff brought a reverse passing off claim against Dastar Corp., distributor of the "Campaign" series of videos which were about the allied campaign in Europe during World War II.  *Dastar*, 539 U.S. at 26-28, 123 S. Ct. at 2044. The Campaign videos included footage from the "Crusade" television series but did not attribute the television series as the origin of this footage. *Id*. New Line Home Video, Inc., which held the exclusive right to distribute the Crusade series on video, sued under the Lanham Act for false designation of origin. *Id*. at 27, 123 S. Ct. at 2044-45. The Supreme Court held that New Line could not recover for false designation of origin because the term "origin of goods" as used in the Lanham Act "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id.* at 37, 123 S. Ct. at 2050.

24

Under *Dastar*, "[t]he right to copy creative works, with or without attribution, is the domain of copyright, not of trademark or unfair competition." *Freeplay Music, Inc. v. Cox Radio*, Inc., 409 F. Supp. 2d 259, 263 (S.D.N.Y. 2005) (*citing Dastar*, 539 U.S. at 33, 123 S. Ct. at 2048). Defendants here are attempting to use the Lanham Act as an impermissible safeguard against a potential failure of their copyright claim, which is prohibited by *Dastar*. *See Clark v. Childs*, 17-CV-4895 (LDH) (SJB), 2017 U.S. Dist. LEXIS 155847, *7 (E.D.N.Y. Sept. 22, 2017).   Since *Dastar*, Lanham Act claims arising from the alleged copying of creative work have been 'clearly foreclosed. *See LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 443 (S.D.N.Y. 2011) ("In *Dastar Corp. v. Twentieth Century Fox Film Corp*., the Supreme Court established that where the good in question is a 'communicative product . . . such as . . . a video,' the term 'origin' in Section 43(a) refers to 'the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods.'").  *See also Agence Fr. Presse v. Morel*, 769 F. Supp. 2d 295, 307 (S.D.N.Y. 2011) ("Because photographs are 'communicative products' protected by copyright, false designation of their authorship is not cognizable under section 43(a)(1)(A) after *Dastar*.").

*Dastar* and its progeny foreclose any claim by Defendants under the Lanham Act against Plaintiff or its licensees for false representation and false advertising because motion pictures are "communicative products" protected by copyright, and false designation of their authorship is not cognizable under section 43(a)(1)(A) after *Dastar*.

## F.  Defendants' Trademark Claims Are Barred By Nominative Fair Use.

Finally, the title card was used to identify the short excerpt of the actual video that the child, Pug, once viewed with his now deceased older brother. In that regard, its use is protected from trademark related claims by the doctrine of nominative fair use. In *Beastie Boys v. Monster Energy*

25

*Co.*, 66 F.Supp.3d 424 (S.D.N.Y. 2014), the Court addressed the doctrine of nominative fair use as follows:

> The doctrine that originated in the Ninth Circuit. *See generally New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302 (9th Cir. 1992). The premise of the doctrine is that, in some instances, "there is no descriptive substitute" for a trademarked name or term, and so "use of the trademark does not imply sponsorship or endorsement of the product because the mark is used only to describe the thing." *Id.* at 306. Applying this doctrine, the Ninth Circuit found no trademark infringement where a newspaper used the name of a band in a survey that asked readers to identify their favorite band member. *Id.* at 308–09. Similarly, the First Circuit found no infringement where a news channel used the trademarked term "Boston Marathon" in reporting on that event. *WCVB–TV v. Boston Athletic Ass'n*, 926 F.2d 42, 44–46 (1st Cir. 1991). Courts have also applied this principle in commercial contexts. For example, the Ninth Circuit held that an automobile repair shop could not advertise its expertise in repairing Volkswagens without using that trademarked name. See *Volkswagenwerk Aktiengesellschaft v. Church,* 411 F.2d 350, 352 (9th Cir.1969).
>
> The Second Circuit has not adopted the Ninth Circuit's formulation of this doctrine. *See Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010). But it has recognized that "a defendant may lawfully use a plaintiff's trademark where doing so is necessary to describe the plaintiff's product and does not imply a false affiliation or endorsement by the plaintiff of the defendant." *Id.* at 102–03 (numerals added); *see also EMI Catalogue P'ship*, 228 F.3d 56 at 65 ("Where a mark incorporates a term that is the only reasonably available means of describing a characteristic of another's goods, the other's use of that term in a descriptive sense is usually protected by the fair use doctrine.").

The single reference to the Defendants' mark "12 O'Clock Boyz" appeared in the title frame for a few seconds starting at 16:56 of Nathan's film and precedes the rest of the Home Video Excerpt. It was necessary to indicate the historical reference to the "Legends" – the original 12 O'Clock style riders in Baltimore – and does not remotely imply a false affiliation with or endorsement of those riders, or of Defendants.  Clearly, it does not create any association with Deafueh Monbo, who is not now and was never a "12 O'Clock" rider. Further, given that the Plaintiff's film is a documentary, and employs methods of journalistic reporting, there was no other way to refer to the excerpt other than by that name. Finally, there has been no suggestion of

26

consumer confusion by Defendants (and not a scintilla of actual evidence of same) during the five years that the documentary has been in circulation. *See* Dkt. Nos. 32, 33 and 38, *passim*.

Also, trademark law has always accorded greater leeway for the use of titles of works of artistic creations than for names of ordinary commercial products, thus allowing breathing space for free expression under the First Amendment right of free speech. Thus, the Lanham Act does not apply to titles of artistic works unless "the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2nd Cir. 1989) (case concerning a movie titled "Fred & Ginger"). Only under these limited circumstances does "the public interest in avoiding consumer confusion outweigh [] the public interest in free expression … support[ing] application of the [Lanham] Act." *Id.*

In *Twentieth Century Fox TV v. Empire Distrib.*, 161 F. Supp. 3d 902 (CD Cal 2016), *aff'd*, 875 F.3d 1191 (9th Cir. 2017), *rehearing den.* (2018), a recent case involving a trademark infringement claim by the record label Empire Distribution, Inc. against Twentieth Century Fox, (owners of the TV series "Empire") and Fox's use of "Empire" as the title of its TV show, the court, citing *Rogers*, found that Fox easily met the protective standard, and dismissed the case because it was an artistic work, and there was no explicit indication, overt claim, or explicit misstatement that caused consumer confusion as to source as between the record label and Fox. *Twentieth Century Fox* is squarely on point under the facts of this case.

### G.  Defendants' Mark is Merely Descriptive.

"A mark is merely descriptive if it immediately conveys information concerning a quality or characteristic of the product or service." *In re MBNA Am. Bank, N.A.*, 340 F. 3d 1328, 1332 (Fed. Cir. 2003). *See also Welding Servs. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007). For example,

if the mark signifies the nature of the goods or services, that mark is considered descriptive. *See Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1524 (11th Cir. 1991) (upholding summary judgment on district court's characterization of "J & Jacorp" as descriptive of a business that invests in corporations); *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,* 277 F. Supp. 2d 356, 362 (S.D.N.Y. 2003) (finding "24 Hour Fitness" descriptive in nature in the context of a health club); *J & J Snack Foods Corp. v. Nestle USA, Inc.*, 149 F. Supp. 2d 136, 147, 151 (D.N.J. 2001) (classifying "Break & Bake" for refrigerated cookie dough as descriptive).

The trademark "12 O'Clock Boyz" claimed by the Defendants in Class 9 (motion pictures), Registration No. 4991835, issued in July 2016, for the term "12 O'Clock" describes the actual goods/services covered as follows:

> Motion Pictures, all featuring documentaries on Baltimore's dirt bike street riders who ride dirt bikes on the city streets of Baltimore, *where riders pop wheelies, and elevate the front of their bikes and ride only on the back wheels until the bikes are perpendicular to the road or in the "12 O'Clock" position*; digital recordings namely, DVDs, Video Discs, and Videocassettes, all featuring documentaries, where riders pop wheelies, and elevate the front of their bikes and ride only on the back wheels until the bikes are perpendicular to the road or in the "12 O'Clock" position.

Meloni Supp'l Dec., <u>Exhibit C</u>.  In other words, it merely describes the "goods" being trademarked – documentaries where riders "pop wheelies" in the "12 O'Clock position."  In the Documentary, Pug perhaps puts it best, when he says:

> "They call 'em the 12 O'Clock Boys . . .because they drop the bike straight back.
> Like the hands on the clock. If you get to 12 o'clock, you the shit."

Meloni Supp'l Dec., <u>Exhibit D</u> (DVD of Documentary *12 O'Clock Boys*), at 2:54-3:05.[22]  *See also,* Meloni Supp'l Dec., <u>Exhibit E</u> (dialogue used in *12 O'Clock Boys*), at p. 1, lines 42-48.

---

[22] The Court can take judicial notice of many articles on the 12 O'Clock stunt:  *See e.g., How to pull 12 o'clock wheelies,* Visor Down magazine, http://www.visordown.com/features/how-to-do-just-about-anything/how-to-pull-12-oclock-wheelies. In an interview in Vice magazine, Lotfy Nathan described the art of pulling a 12 O'Clock

Indeed, the term "12 O'Clock" is a common phrase used by other groups or gangs who perform the 12 O'Clock stunt. *See, e.g.,* King David Productions "*12 O'clock Boys - Wheelie Boyz (Scene - Riders With Muscle)* (*https://www.youtube.com/watch?v=0aEXaaL8ISo*); [23] Motogeo magazine, "The 12 O'clock wheelie" ("What I was staring at is apparently called the 12 o'clock wheelie; a total vertical wheelie that causes you to scrape anything hanging beneath the exhaust pipe") (*http://www.motogeo.com/stunt-school-%E2%80%93-the-12-o%E2%80%99clock-wheelie/*); New York Magazine, "*50 Blocks at 12 O'Clock (or Die Trying)*" (article about Oiste!!, a local legend in Bronx, New York and member of the Ruff Ryders motorcycle club, and the phenomenon of Banshee motorcycle riders like Oiste doing 12 O'Clock wheelies), *http://nymag.com/nymetro/news/sports/features/12121/*; Planet Knox magazine, "*Jamie Robinson's 12 o'clock wheelie*", *https://www.planet-knox.com/2009/04/jamie-robinsons-12-oclock-wheelie/* ("Ex-British Supersport racer Jamie Robinson has been in LA learning how to master the 12 o'clock wheelie, which involves scraping the bike's number plate and exhaust on the floor, then getting it back onto 2 wheels").[24]

Even assuming Defendants had valid trademark registrations, the use of the movie title "12 O'Clock Boys" by Plaintiff would insulate Plaintiff (and its licensees) from any legitimate attack by Defendants. Under a standard fair use analysis, the Lanham Act, 15 U.S.C. § 1051 *et seq.,* does not apply to the Documentary because its film title (as with the Defendants' film title) has artistic

---

wheelie as follows: "It's more about skills, yeah. There's this kind of choreography to it, and the reason they're called the Twelve O'Clock Boyz is because the main goal is to achieve this perfect vertical wheelie, and whoever can keep a wheelie up the longest and nicest gets the most respect. It's illegal, but I think it's a lot more innocent than some of their alternatives." https://www.vice.com/en_us/article/3b5pv3/the-wheeling-dirt-bike-gangs-of-baltimore-twelve-o-clock-boyz-Lotfy-nathan. *See* Meloni Supp'l Dec. as Exhibit F (two articles).

[23] King David Productions sells DVDs of their 12 O'Clock stunt riders: "King David Productions Order Copies: $15.00. Send a Message or Visit: www.kingdproductions.com - DVDs Contain: 60 min Film, 1:22:00 Extended Ver, Directors Comments, Scene Selections, Trailer and Teasers." https://www.youtube.com/watch?v=0aEXaaL8ISo.

[24] The term "boyz" is a common non-standard, vernacular spelling of the word "boys" that is common in various countries. *See* http://www.pbs.org/speak/ahead/globalamerican/slang/. It is also a term found in 50 known trademark registrations. *See* Meloni Supp'l Dec., Exhibit H.

relevance to the underlying work. It merely describes the subject of the Documentary, and does not explicitly mislead as to the source and/or content of the Documentary. The descriptive use of the title is fair because it tells the consumer what the film is about—the story of various groups of urban dirt-bike riders in Baltimore who ride in the "12 O'Clock" position, and one boy's fascination with and desire to join one of those biker groups who call themselves the 12 O'Clock Boyz. Also, such fair and descriptive use is in good faith because Plaintiff expressly identified itself in the film as the source of the film, not Defendants.

In short, there was no infringement of Defendants' purported trademark, assuming *arguendo* they even qualify for one. Thus, there can be no meritorious defense asserted to Plaintiff's declaratory judgment claim of non-infringement of trademark.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion in its entirety, together with such other and further relief as it deems just and proper.

Respectfully submitted,

MELONI & McCAFFREY

By: _____
        Robert S. Meloni
        Thomas P. McCaffrey
3 Columbus Circle, 15th Floor
New York, New York 10019

*Attorneys for Plaintiff*

30