UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

OSCILLOSCOPE PICTURES, INC.,                    )
                                                )
                              Plaintiff,         )          Case No.:17-cv-07458-MKB-ST
          v.                                    )
                                                )
DEAFUEH MONBO AND TAJE MONBO,                   )
both individually and doing business as         )
12 O'CLOCK BOYZ,                                )
                                                )
                              Defendants.        )

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT TAJE MONBO'S MOTION TO
VACATE CLERK'S ENTRY OF DEFAULT**

MELONI & McCAFFREY
A Professional Corporation
Robert S. Meloni
Thomas P. McCaffrey
3 Columbus Circle, 15th Floor
New York, New York 10019

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

RELEVANT FACTS .................................................................................................... 1

ARGUMENT ............................................................................................................... 4

    I.    Defendant Taje Monbo Has Waived All Jurisdictional Arguments ................................ 4

    II.   The Default Was Willful ............................................................................................ 4

    III.  There Are No Substantive Meritorious Defenses ........................................................ 7

          A.   Defendant Has Not Satisfied The Evidentiary Standard ........................................ 7

          B.   Defendant Proffers No Meritorious Defenses to Copyright Fair Use Claim .......... 9

             (i) Plaintiff's Pleadings Have Alleged All Elements of Fair Use ......................... 12

             (ii) Defendant has Failed to Carry His Burden .................................................... 14

          C.   Defendant's Defense to the Copyright License Claim is Facially Insufficient .....15

             (i)   Defendant's Attempted Factual Adjustments Fail to Cure
                  Legal Deficiencies ...................................................................................15

             (ii)  Relevant Allegations by Plaintiff ....................................................................17

             (iii) Whitaker is an "Author" of the Home Video .................................................. 18

             (iv) Whitaker Granted A Non-Exclusive License .................................................20

             (v) Defendants Have No Meritorious Defense to the License Claim .................21

          D.   Defendants' Defense to the Trademark Claim is Facially Insufficient ................21

          E.   Defendants' Trademark Claims Are Barred By
             *Dastar* and Nominative Fair Use ......................................................................25

CONCLUSION .........................................................................................................25

i

## TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*Abilene Music, Inc. v. Sony Music Entm't, Inc.,*
    320 F. Supp. 2d 84 (S.D.N.Y. 2003)........................................................9

*Action S.A. v. Marc Rich & Co.,*
    951 F.2d 504 (2d Cir. 1991).................................................................6

*Am. Alliance Ins. Co. v. Eagle Ins. Co.,*
    92 F.3d 57 (2d Cir. 1996) ..................................................................6

*American Arbitration Ass'n v. Defonseca,*
    93 Civ. 2424, 1997 U.S. Dist. LEXIS 2433 (S.D.N.Y. 1997) ..................................7 n.6

*Angel v. Queens Blvd. Car Wash,*
    06 Civ. 6667, 2008 U.S. Dist. LEXIS 1358 (E.D.N.Y. Jan. 8, 2008).......................7

*Authors Guild, Inc. v. Google,*
    804 F.3d 202 (2015).......................................................................9-12

*Authors Guild, Inc. v. HathiTrust,*
    755 F.3d 87 (2d Cir. 2014)................................................................9

*Bank of New York v. Meridien Biao Bank Tanz,*
    95 CV 4856, 1998 U.S. Dist. LEXIS 11288 (S.D.N.Y. July 24, 1998)...................8

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
    448 F.3d 605 (2d Cir. 2006)...............................................................11 n.9

*Blakeslee v. Royal Ins. Co. of Am.,*
    93 Civ, 1633, 1998 U.S. Dist., LEXIS 5977 (S.D.N.Y. April 28, 1998)..................1 n.2

*Bleistein v. Donaldson Lithographing Co.,*
    188 U.S. 239, 23 S. Ct. 298, 47 L. Ed. 460 (1903)....................................18

*Brown v. Gabbidon,*
    No. 06 CV 8148, 2007 U.S. Dist. LEXIS 35134 (S.D.N.Y. May 14, 2007) ............8

*Burrow-Giles Lithographic Co. v. Sarony,*
    111 U.S. 53, 4 S. Ct. 279, 28 L. Ed. 349 (1884).....................................18

*Buti v. Perosa, S.R.L.,*
    139 F.3d 98 (2d Cir. 1998)...............................................................23 n.25

*Campbell v. Acuff-Rose Music, Inc.*,
　　510 U.S. 569 (1994)........................................................................9, 10 & n.8

*Cariou v. Prince*,
　　714 F.3d 694 (2d Cir. 2013)...........................................................10

*China Mariners' Assur. Corp. v. M.T. W.M. Vacy Ash*,
　　96 Civ. 9553, 1999 U.S. Dist. LEXIS 2674 (S.D.N.Y. March 9, 1999)...................15 n.12

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
　　539 U.S. 23, 123 S. Ct. 2041, 156 L. Ed. 2d 18 (2003) ................................ 25

*Desiderio v. Rubin*,
　　234 A.D.2d 581, 652 N.Y.S.2d 68 (2d Dep't 1996)...................................1 n.2

*DiStiso v. Cook*,
　　691 F.3d 226 (2d Cir. 2012)) ..........................................................8 n.7

*DPWN Holdings (USA), Inc. v. United Air Lines*,
　　871 F. Supp. 2d 143 (E.D.N.Y. 2012) ...................................................5

*Feel Better Kids, Inc. v. Kids in Need USA, Inc.*,
　　CV-06-0023, 2012 U.S. Dist. LEXIS 139770 (E.D.N.Y. Aug. 27, 2012) ...............8, 23

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
　　499 U.S. 340, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991).......................................18

*Financial Information v. Moody's Investors Serv.*,
　　No. 81 Civ. 6001, 1984 U.S. Dist. LEXIS 20579 (S.D.N.Y. Jan. 10, 1984)............9

*Finkel v. Hall-Mark Elec. Supplies Corp.*,
　　07 Civ. 2376, 2011 U.S. Dist. LEXIS 76716 (E.D.N.Y. July 13, 2011) ..................6

*First City Federal Sav. Bank v. Dennis*
　　680 F. Supp. 579 (S.D.N.Y. 1988).........................................................5

*Folsom v. Marsh*,
　　9 F. Cas. 342 (C.C.D. Mass. 1841) .......................................................12 n.10

*Fox News Network, LLC v. TVEyes, Inc.*,
　　883 F.3d 169 (2d Cir. 2018)..............................................................11

*Garcia v. Google, Inc.*,
　　743 F.3d 1258 (9th Cir. 2013) ...........................................................19 & n.19

*Gonzalez v. Rakkas,*
    93 CV 3229, 1996 U.S. Dist. LEXIS 22760 (E.D.N.Y. Oct. 21, 1996)).................8

*Gov't Employees Ins. Co. v. Right Solution Med. Supply, Inc.,*
    12-CV-0908, 2012 U.S. Dist. LEXIS 179621 (E.D.N.Y. Dec. 19, 2012)................7 n.6

*Gucci Am., Inc. v. Gold Ctr. Jewelry,*
    158 F.3d 631 (2d Cir. 1998)....................................................................6

*Harper & Row Publishers, Inc. v. Nation Enterprises,*
    471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)..........................11, 15 n.12

*Heymann v. Brechner,*
    95 Civ. 1329, 1996 U.S. Dist. LEXIS 14936 (S.D.N.Y. Oct. 7, 1996) ....................6

*Hvide Marine Int'l v. Employers Ins. of Wausau,*
    No. 88 CIV 1523, 1989 U.S. Dist. LEXIS 13528 (S.D.N.Y. Nov. 15, 1986) ..........18 n.16

*Janus v. Regalis Constr., Inc.,*
    11-CV-5788, 2012 U.S. Dist. LEXIS 127008 (E.D.N.Y. July 23, 2012).................15 n.13

*Jorgensen v. Epic/Sony Records,*
    351 F.3d 46 (2d Cir. 2003).............................................................8 n.7, 23

*Kauhsen v. Aventura Motors, Inc.,*
    Civil Action No. 09-4114, 2010 U.S. Dist. LEXIS 55554
    (E.D.N.Y. June 7, 2010)) ...........................................................7 n.6, 21

*Kirno Hill Corp. v. Holt,*
    618 F.2d 982 (2d Cir. 1980)....................................................................6

*Maxtone-Graham v. Burtchaell,*
    803 F.2d 1253 (2d Cir. 1986) *cert. denied,*
    481 U.S. 1059, 95 L. Ed. 2d 856, 107 S. Ct. 2201 (1987)........................15 n.12

*Nebraskaland, Inc. v. Sunoco, Inc. (R & M),*
    No. 10-CV-1091, 2013 U.S. Dist. LEXIS 148283 (E.D.N.Y. Oct. 11, 2013)..........5

*Neirbo Co. v. Bethlehem Shipbuilding Corp.,*
    308 U.S. 165, 60 S. Ct. 153, 84 L. Ed. 167 (1939)...................................4

*Nemeroff v. Abelson,*
    620 F.2d 339 (2d Cir. 1980)...............................................................16 n.14

*Nunez v. Caribbean International News Corp.,*
    235 F.3d 18 (1st Cir. 2000)...............................................................11 n.9

*Patterson v. Cnty. of Oneida,*
    375 F.3d 206 (2d Cir. 2004).............................................................................8 n.7

*Salomon v. 318 Fashion, Inc.*
    No. 93-civ-7699, 111994 U.S Dist. LEXIS 17883 (S.D.N.Y. Dec. 14, 1994)..........6

*Salomon v. 1498 Realty,*
    148 F.R.D. 127 (S.D.N.Y. 1993) ...........................................................8, 15, 17, 24

*S.E.C. v. Breed,*
    01 Civ. 7798, 2004 U.S. Dist. LEXIS 16106 (S.D.N.Y. Aug. 13, 2004) .................7

*S.E.C. v. McNulty,*
    137 F.3d 732 (2d Cir. 1998)......................................................................................8

*Schlaifer Nance & Co. v. Estate of Warhol,*
    194 F.3d 323 (2d Cir. 1999)..............................................................................16 n.14

*Sheldon v. Plot Commerce,*
    2016 U.S. Dist. LEXIS 116135 (E.D.N.Y. Feb. 26, 2018).......................................5

*Sony Corp. v. Elm State Elecs., Inc.,*
    800 F.2d 317 (2d Cir. 1986)...........................................................................7 n.6, 9

*Todtman, Nachamie, Spizz & Johns, P.C. v. Ashraf,*
    241 F.R.D. 451 (S.D.N.Y. 2007) ...........................................................................15

*United Drug Co. v. Theodore Rectanus Co.,*
    248 U.S. 90, 39 S. Ct. 48, 63 L. Ed. 141 (1918)........................................23 n.25

*United States v. Joseph Hirsch Co.,*
    No. 85-1546, 1989 U.S. Dist. LEXIS 2246 (E.D.N.Y. Feb. 28, 1989). ...................8

*Weifang Xinli Plastic Prods. v. JBM Trading, Inc.,*
    11 Civ. 2710, 2014 U.S. Dist. LEXIS 119073 (E.D.N.Y. Aug. 26, 2014)...............6

*Wright v. Warner Books, Inc.,*
    953 F.2d 731 (2d Cir. 1991)..............................................................................15 n.12

**Statutes**                                                                                        **Pages**

17 U.S.C. §101 ...................................................................................................18

17 U.S.C. §102(a)(4) .......................................................................................19 n.19

17 U.S.C. §107 ...................................................................................................9

17 U.S.C. §201(a) .............................................................................................18

**Secondary Sources**

Michael D. Murray, What Is Transformative? An Explanatory Synthesis of the Convergence of
Transformation and Predominant Purpose in Copyright Fair Use Law, 11 CHI.-KENT J.
INTELL. PROP. 260, 273–92 (2012) ...................................................................10 n.8

1 Nimmer on Copyright §6.03 (2018) .................................................................20

3 Nimmer on Copyright §13.05[A] (1984) ..........................................................11

## PRELIMINARY STATEMENT

Plaintiff Oscilloscope Pictures, Inc. submits this memorandum of law in response to the Declarations of Taje Monbo dated August 2, 2018 ("Taje Dec.") and Michael Whitaker, Jr., sworn to July 26, 2018 ("Whitaker Dec."), and the Memorandum of Law ("Taje Mem."), in Support of Defendant Taje Monbo's Motion to Vacate Clerk's Entry of Default.

This motion constitutes an improper attempt at a legal mulligan, with Taje Monbo endeavoring to reargue the already *sub juris* motion filed by his sister, Deafueh Monbo.   Taje Monbo ineffectively seeks to cure the glaring factual omissions in his sister's motion, for which he previously submitted his own substantive Declaration, by restating facts not based upon personal knowledge but "upon information and belief", while asserting the exact same bald, boilerplate legal arguments that also appear in his accompanying memorandum of law.   This questionable motion practice further delays the final resolution of this action and unnecessarily increases Plaintiff's legal fees, which Plaintiff will be compelled to seek to recover at the appropriate time.

## RELEVANT FACTS

First, Taje Monbo concedes personal jurisdiction. He expresses no reservation of rights concerning personal jurisdiction and instead argues that he comes before the Court to "appear and defend" so that the case could be "adjudicated on the merits".  Taje Mem. pp. 1, 4.  He also states that his sister, Deafueh Monbo, typically handled the enforcement of their intellectual property rights and that he authorized his sister's issuance of the offending takedown Notices to enforce Defendants' rights (Taje Dec., ¶8, Taje Mem., p. 3[1]), which, as previously argued in Plaintiff's opposition to Deafueh Monbo's motion to vacate, subsequently caused injury to Plaintiff in this jurisdiction and supports long arm jurisdiction over both Defendants under New York law. *See* DE-39, pp. 9-10.

---

[1] "Defendant Taje Monbo authorized the issuance of DMCA takedown notices to enforce the Defendants' rights".

1

Second, Taje Monbo concedes that: (1) he and his sister "have operated and managed the 12 O'Clock Boyz brand, and media works for over 15 years and are united in interest with respect to the legacy that is the 12 O'Clock Boyz." (Taje Dec., ₱23)[2]; (2) that his sister has typically handled the filings and enforcement of the 12 O'Clock Boyz intellectual property rights (Taje Dec., ₱8); (3) that his sister operated the email account deemonbo@yahoo.com and the Twitter Account @12OClockboyz[3], and that service on both those accounts was proper pursuant to this Court's order (Taje Dec., ₱₱16, 17); and (4) that his sister made him aware of this lawsuit and that it was his mistaken understanding and intent that his sister could and did protect his interests in this action through her appearance and motion practice.  Taje Dec., ₱₱18, 22.  Indeed, Defendant notes in his Memorandum of Law, that his reliance on his sister's representations was also justified because "Defendants were named individually and doing business as 12 O'Clock Boyz."  Taje Mem. p. 8.

Moreover, Defendant's motion is controlled by his determinant legal concession that "willfulness is preeminent, and a willful default will not normally be set aside." Taje Mem. p. 8. Defendant and his sister's unity of interest in all things "12 O'Clock Boyz" would encompass Deafueh's operation of the Twitter Account @12OClockboyz, through which she "brazenly" taunted the Plaintiff and disrespected the Court with such tweets as "YEAH. YEAH, THROW YOUR LAWSUIT ON THE GRASS AND LEAVE IT THERE". Defendant admittedly granted unfettered agency to Deafueh on all things 12 O'Clock Boyz, and so he must answer for Deafueh's

---

[2] "Parties are united in interest when their 'interest in the subject-matter is such that they stand or fall together and that judgment against one will similarly affect the other.'" *Blakeslee v. Royal Ins. Co. of Am.*, 93 Civ, 1633, 1998 U.S. Dist., LEXIS 5977, *12 (S.D.N.Y. April 28, 1998) (*quoting Desiderio v. Rubin*, 234 A.D.2d 581, 652 N.Y.S.2d 68, 70 (2d Dep't 1996) (quotations omitted)).

[3] While Defendant states that he does not have access to "P.O. Box 135, Owings Mills, Maryland," he does not deny that his sister controls that post office box. Taje Dec., *passim*. In the Take Down Notices that Taje Monbo authorized (Taje Mem. p. 3), the Defendants list their contact information as follows: 12 O'Clock Boyz, Attention: Deafueh Monbo, *P.O. Box 135, Owing Mills, Maryland 21117*; Email: Deemonbo@yahoo.com; Phone: (410) 656-9040. See DE-11-1., ₱7 and Ex. A (italics added). His attempt to distance himself from this point of proper service is disingenuous at best.

willful conduct on both of their behalves after being properly served with the pleadings pursuant to this Court's order, including without limitation, her blatant choice to ignore the pleadings in lieu of internet rants on behalf of the 12 O'Clock Boyz.

In addition, Defendant's submissions in support of his purported meritorious defenses primarily consist of legally insufficient, conclusory and self-serving statements whose few relevant allegations are made upon information and belief, and not upon the personal knowledge of the declarant. They contain no admissible evidence to support any purported meritorious defenses, including the bald legal conclusion that Mr. Whitaker was not an author of the video, had no authority to license its use, or to give Plaintiff a verbal or written license. Taje Dec., ⁋⁋27-29. Defendant concedes that Mr. Whitaker gave Lotfy Nathan the Video at issue (Whitaker Dec. ⁋10) and signed the General Release and Consent Form (Whitaker Dec., ⁋11) and neither Defendant nor Mr. Whitaker denies that the General Release and Consent Form contained the quoted language which granted Plaintiff the written license to use the video or that Mr. Whitaker told Mr. Nathan at the time he delivered the video: "'You can use the [Home Video] tape' in the Documentary." *Compare* Taje Dec. and Whitaker Dec. *passim*, *with* DE-1, ⁋28. Indeed, Defendant concedes that Mr. Whitaker's conduct at the time of his delivery of that Video, created "a colorable appearance of authority." Taje Dec., ⁋31.

More specifically, nothing in Defendant's Declaration, Mr. Whitaker's Declaration, or Defendant's Memorandum of Law addresses, in any substantive way, or presents any evidentiary facts to support a meritorious defense to Plaintiff's second claim for a Declaratory Judgment of non-infringement of copyright based upon the determinative doctrine of fair use. Defendant does not challenge the alleged facts concerning the transformative nature of the work in connection with the impact on Pug, the primary character in Plaintiff's film, as the set forth in great detail in the

3

Complaint.  *Compare* DE-1, ¶¶31-34, 69-71 *with* Taje Dec. and Whitaker Dec. *passim*.  Moreover, the fact-driven nature of the fair use determination does not protect the copyright holder from summary disposition of his claims where, as here, there are no material factual disputes, as Defendant's papers do not contain even a hint of a suggestion of any facts, which, if proven at trial, would constitute a complete defense to Plaintiff's fair use bar to copyright infringement.

Finally, despite the continuous challenge to Defendants' purported trademarks from the onset of this action, Defendant has, yet again, offered no evidence to support a viable meritorious defense to Plaintiff's claim seeking cancellation of their trademarks, which, as alleged in the Complaint and demonstrated herein, are facially invalid.   As a result, there are no meritorious defenses to support a motion to vacate Defendant Taje Monbo's default.

## ARGUMENT

## I.   Defendant Taje Monbo Has Waived All Jurisdictional Arguments.

Taje Monbo's submission of his declaration on his motion to vacate the default – as well as his prior unrestricted submission as part of his sister's motion – without reserving his own jurisdictional defenses constitutes waiver and submission to the jurisdiction of this Court.  *See Neirbo Co. v. Bethlehem Shipbuilding Corp.,* 308 U.S. 165, 168, 60 S. Ct. 153, 84 L. Ed. 167 (1939) ("[L]ack of personal jurisdiction is a privileged defense that can be waived 'by failure to assert it seasonably, by formal submission in a cause, or by submission through conduct'").

## II.  The Default Was Willful.

Given Defendants' admittedly incestuous business relationship with respect to 12 O'Clock Boyz set forth above, Taje Monbo cannot now argue lack of service of process.  Courts have recognized that the fundamental purpose of service is to give a defendant notice of the claims against them and that due process requires that service be "reasonably calculated, under all the

circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Sheldon v. Plot Commerce*, 2016 U.S. Dist. LEXIS 116135, *19-20 (E.D.N.Y. Feb. 26, 2018) (*quoting DPWN Holdings (USA), Inc. v. United Air Lines*, 871 F. Supp. 2d 143, 154 (E.D.N.Y. 2012)). This Court has already ruled that the Plaintiff's alternative service on deemonbo@yahoo.com, the Twitter Account @12OClockboyz and P.O. Box 135, Owings Mills, Maryland would satisfy the notice and opportunity requirements in *Sheldon*. *See* DE-13.  Defendant admitted that his sister informed him of the action. Taje Dec., ⁋18.  He cannot argue that he was not apprised of the pendency of the action and afforded the opportunity to present his objections.  Defendant's lack of service arguments are a non-starter.

Moreover, Defendant's total abdication of the control of the 12 O'Clock Boyz brand to his sister included Deafueh's operation of the Twitter Account @12OClockboyz, through which she "brazenly" taunted the Plaintiff and disrespected the Court with such tweets as "YEAH. YEAH, THROW YOUR LAWSUIT ON THE GRASS AND LEAVE IT THERE"[4], instead of properly responding to pleadings.  Deafueh's actual authority in this instance may be inferred from Taje's recognition of or acquiescence to Deafueh's 12 O'Clock Boyz activities. *See First City Federal Sav. Bank v. Dennis*, 680 F. Supp. 579 (S.D.N.Y. 1988) (agency relationship may be implied where principal recognizes and acquiesces in an act done by the agent.)  "When an agent acts on behalf of the principal, then the principal must answer to an innocent third person for the misconduct of an agent acting within the scope of its authority." *Nebraskaland, Inc. v. Sunoco*, Inc. (R & M), No. 10-CV-1091 (RJD), 2013 U.S. Dist. LEXIS 148283, (E.D.N.Y. Oct. 11, 2013) (internal quotation

---

[4] Indeed, instead of filing their responses to the Complaint, Defendants lauded the damages they inflicted upon Plaintiff with Tweets like the following: "*Like Bey, the Official 12 O'ClockBoyz team slaps Partners and Sub-partners of @OscopeLabs in the United States, Australia, France and South Africa with Copyright Takedown Notices for IMPOSTERING the Original #12OClockBoys (2001) and for Oscilloscope's FAILURE TO PROVIDE RECEIPTS*" [Real 12 O'Clock Boyz@12OClockBoyz_12 Dec 2017], which retweeted the below post by Jorge Luis Lopez found at https://twitter.com/12OClockBoyz_?lang=en: "Beyonce stops production of Bieronce beer with cease and desist letter". DE-11-1, ¶20 and Ex. E.

marks and citation omitted). Finally, actions taken by an agent within the scope of her agency are binding on even an undisclosed principal. *See Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980).

Defendant must accept the bitter with the sweet that arises from this admittedly unfettered grant of absolute control to his sister on all things 12 O'Clock Boyz, and answer for Deafueh's willful conduct after being properly served with the pleadings pursuant to this Court's order, including her choice to blatantly ignore the action in lieu of her internet rants on behalf of the 12 O'Clock Boyz.  Allowing Deafueh's deliberate decision to ignore the lawsuit to inure to Taje's benefit "'would be to reward and encourage [their] sheer laziness and to promote the waste of judicial resources.'"  *Heymann v. Brechner*, 95 Civ. 1329 (CSH), 1996 U.S. Dit. LEXIS 14936, \*20 (S.D.N.Y. Oct. 7, 1996) (q*uoting Salomon v. 318 Fashion, Inc.* No. 93-civ-7699, 111994 U.S Dist. LEXIS 17883 (S.D.N.Y. Dec. 14, 1994).

Moreover, "[b]ad faith is not a necessary predicate to concluding that a defendant acted 'willfully' for purposes of Fed. R. Civ. P. 60(b)(1)," *Weifang Xinli Plastic Prods. v. JBM Trading, Inc.,* 11 Civ. 2710 (WFK) (LB), 2014 U.S. Dist. LEXIS 119073, at \*16 (E.D.N.Y. Aug. 26, 2014) (*citing Gucci Am., Inc. v. Gold Ctr. Jewelr*y, 158 F.3d 631, 635 (2d Cir. 1998)).  However, in light of this record, a finding of bad faith will suffice to establish willfulness.  *See Gucci Am*., 158 F.3d at 635.

"If a default is determined to be willful, that fact alone can justify denying a motion to vacate default judgment." *Finkel v. Hall-Mark Elec. Supplies Corp*., 07 Civ. 2376 (NGG) (JO), 2011 U.S. Dist. LEXIS 76716, \*8 (E.D.N.Y. July 13, 2011) (*citing Action S.A. v. Marc Rich & Co.,* 951 F.2d 504, 507 (2d Cir. 1991) ("A default should not be set aside when it is found to be willful."); *Am. Alliance Ins. Co. v. Eagle Ins. Co*., 92 F.3d 57, 60 (2d Cir. 1996) (noting that the

Court of Appeals for the Second Circuit has "refused to vacate a judgment where the moving party had apparently made a strategic decision to default"); *Angel v. Queens Blvd. Car Wash*, 06 Civ. 6667 (CBA), 2008 U.S. Dist. LEXIS 1358, *8 (E.D.N.Y. Jan. 8, 2008) ("[A] default will not be vacated where the court concludes that the defaulting party made a strategic decision to default.").

Thus, Defendant's motion is controlled by his own determinant legal concession that "willfulness is preeminent, and a willful default will not normally be set aside." Taje Mem. p. 8. *See also, SEC v. Breed*, 01 Civ. 7798 (CSH), 2004 U.S. Dist. LEXIS 16106, *37-38 (S.D.N.Y. Aug. 13, 2004) ("willfulness is preeminent, and a willful default will not normally be set aside. Consideration of the remaining criteria does not give rise to equities sufficient to outweigh the impact of defendants' willful conduct.")(internal citations & quotations omitted).

## III.   There Are No Substantive Meritorious Defenses.

### A.   Defendant Has Not Satisfied The Evidentiary Standard.[5]

A defendant seeking to vacate an entry of a default must present some evidence beyond conclusory denials to support his meritorious defense. *See Amalgamated Life Ins. Co. v. Boatswain*, 17-CV-00091 (PKC) (ST), 2018 U.S. Dist. LEXIS 122954 *9 (E.D.N.Y July 20, 2018).[6]

---

[5]   The same arguments presented herein apply equally to Taje Monbo's complete failure to address, no less carry his burden to present a meritorious defense to Plaintiff's claim for Tortious Interference. Compare DE-1, ¶¶105-108 with Taje Dec., Taje Mem., passim.

[6] *See also Sony Corp. v. Elm State Elecs., Inc.*, 800 F.2d 317, 320-21 (2d Cir. 1986) ("Although in an answer general denials normally are enough to raise a meritorious defense, the moving party on a motion to reopen a default must support its general denials with some underlying facts."); *Gov't Employees Ins. Co. v. Right Solution Med. Supply, Inc.*, 12-CV-0908 (MKB) (JO), 2012 U.S. Dist. LEXIS 179621 *14-15 (E.D.N.Y. Dec. 19, 2012) ("As evidence of a meritorious defense, Klikshteyn denies that he or Right Solution engaged in 'any wrongdoing . . . with respect to any of the matters in the Complaint,' and swears that he and Right Solution 'adhered' to the "relevant guidelines for markups of pricing of Durable Medical Equipment and supplies.[ ] Such conclusory and self-serving denials of liability, even in the form of an affidavit, do not constitute anything approaching 'credible evidence of facts 'which directly relate[ ] . . . to the allegations [in the complaint] and raise[ ] a serious question as to the validity of those allegations.'"); *Kauhsen v. Aventura Motors, Inc.*, Civil Action No. 09-4114, 2010 U.S. Dist. LEXIS 55554, *15 (E.D.N.Y. June 7, 2010) (Court castigated defendant's counsel for its "bald legal conclusions" and "absence of facts or information beyond conclusory assertions" in support of a meritorious defense); *American Arbitration Ass'n v. Defonseca*, 93 Civ. 2424, 1997 U.S. Dist. LEXIS 2433, *7 (S.D.N.Y. 1997) (defendants affidavits that conclusory assert only that they have a "bona fide defense against plaintiff's contentions" and contain no further description,

The meritorious defense must not only be available at law, but it must also be justified by the facts. *Gonzalez v. Rakkas*, 93 CV 3229 (JS), 1996 U.S. Dist. LEXIS 22760 *16-17 (E.D.N.Y. Oct. 21, 1996) (*citing United States v. Joseph Hirsch Co.*, No. 85-1546, 1989 U.S. Dist. LEXIS 2246 (E.D.N.Y. Feb. 28, 1989)). The movant seeking to vacate a default must "articulate a defense with a degree of specificity which directly relates that defense to the allegations set forth in plaintiff's pleadings and raises a serious question as to the validity of those allegations." *Salomon v. 1498 Realty*, 148 F.R.D. 127, 130 (S.D.N.Y. 1993). Moreover, the allegations supporting a meritorious defense must be made by someone with "personal knowledge" in order to constitute "evidence of facts" sufficient to vacate a default. *Feel Better Kids, Inc. v. Kids in Need USA, Inc.,* CV-06-0023 (DRH) (AKT), 2012 U.S. Dist. LEXIS 139770 *21-22 (E.D.N.Y. Aug. 27, 2012) (*citing McNulty*).[7]

Thus, a meritorious defense is measured not by whether there is a likelihood that it will carry the day, but *whether the evidence submitted, if proven at trial, would constitute a complete defense*. *See S.E.C. v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998); *Bank of New York v. Meridien Biao Bank Tanz*, 95 CV 4856 (SS), 1998 U.S. Dist. LEXIS 11288 *15 (S.D.N.Y. July 24, 1998). Indeed, without the prospect of a valid defense, "there is little point in setting aside the default judgment." *Brown v. Gabbidon*, No. 06 Civ. 8148, 2007 U.S. Dist. LEXIS 35134 (S.D.N.Y. May 14, 2007).

---

legal argument or factual support is clearly insufficient to meet defendants' burden of establishing a meritorious defense to plaintiff's complaint).

[7] *See generally, DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"); *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (Rule 56's "requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'"); *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 57 n. 8 (2d Cir. 2003) (a declaration stating "upon information and belief" is not "admissible evidence" required under Rule 56).

Beyond factual admissions that only undermine his position, Taje Monbo's Declaration consists of improper allegations made upon information and belief and not on personal knowledge, or unsupported, conclusory and self-serving allegations of fact and improper legal arguments.  As a result, Defendant has failed to carry his burden of presenting meritorious defenses.  *See Sony Corp. v. Elm State Elecs, Inc.*, 800 F.2d 317, 320-21 (2d Cir. 1986).

**B.   Defendant Proffers No Meritorious Defenses to Copyright Fair Use Claim.**

Section 107 of the Copyright Act of 1976 recognizes fair use as a complete defense to a claim of infringement.  *Abilene Music, Inc. v. Sony Music Entm't, Inc.*, 320 F. Supp. 2d 84, 88 (S.D.N.Y. 2003).  *See Financial Information v. Moody's Investors Serv.*, No. 81 Civ. 6001 (RLC), 1984 U.S. Dist. LEXIS 20579, *17 (S.D.N.Y. Jan. 10, 1984) ("Accordingly, I find that the fair use doctrine shields defendant's action and operates as a complete defense to plaintiff's claims under the Copyright Act.").

A Fair Use analysis requires consideration of four factors: (1) purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) nature of the copyrighted work; (3) amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. §107.

Under the first statutory factor – the "purpose and character" of the secondary use – the primary inquiry is whether the use "communicates something new and different from the original or [otherwise] expands its utility," that is, whether the use is "transformative."  *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015).   To be transformative, a use must "do[] something more than repackage or republish the original copyrighted work"; it must "'add[] something new, with a further purpose or different character, altering the first with new expression, meaning or message . . . .'"  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014) (*quoting*

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).   "Although . . . transformative use is not absolutely necessary for a finding of fair use . . . [transformative] works . . . lie at the heart of the fair use doctrine". *Campbell*, 510 U.S. at 579. "[T]he [less] transformative the new work, the [more] will be the significance of other factors, like commercialism . . . ." *Id.* [8]

Thus, the *purpose* of the use is one way in which the Court recognizes that a use of a work can add something new. In *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013), the Second Circuit identified a second kind of transformative use – focusing on the content of the use instead of the purpose. In finding most of the contested works of Richard Prince's appropriation art (consisting  of unauthorized  copies  of  copyrighted  photographs taken by others) to be fair uses, the Second Circuit focused on the content of Prince's art, which   juxtaposed   images of Rastafarians with images of partially naked women. *Id.,* at 706. The Court emphasized that Prince's use transformed the content or character of the photographs, not the purpose of use, in finding fair use: "[L]ooking at the artworks and the photographs side-by-side, we conclude that Prince's images . . . have a different character, give Cariou's photographs a new expression, and employ new aesthetics with creative and communicative results distinct from Cariou's." *Id.* at 707–08.

Finally, copying  from an original for the purpose of *criticism or commentary* on the original or provision of information about it tends most clearly to satisfy *Campbell*'s notion of the "transformative" purpose involved in the analysis of the first fair use factor. *Authors Guild*, 804

---

[8] Since  the  Supreme Court's decision in *Campbell,* courts often focus their analysis on the first factor of fair use, namely, the purpose and character of the use of the copyrighted content, and specifically whether such use is transformative. The Supreme Court also noted that because the statute defining fair use calls for a case-by-case approach, the task of evaluating a given fair use cannot be reduced to simple bright line rules. *Campbell*, 510 U.S. at 577. *See* Michael D. Murray, *What Is Transformative? An Explanatory Synthesis of the Convergence of Transformation and Predominant Purpose in Copyright Fair Use Law*, 11 CHI.-KENT J. INTELL. PROP. 260, 273–92 (2012) (concluding, on the basis of a survey of federal appellate decisions, that with respect to the transformative  factor  of  the  test,  the  courts focus on transformative purpose because each and every approved fair use involved a change in the predominant purpose for the use of the work and not simply a change in the character – the form or contents – of the work).

F.3d at 215–16. A paradigmatic example of this kind of transformative work, where one work borrows from the same type of work, is a book review. A book review often quotes portions of a copyrighted book, but in the context of the reviewer's own critique of the book. [9]

The second statutory factor is "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor "has rarely played a significant role in the determination of a fair use dispute." *Fox News Network, LLC v. TVEyes, Inc*., 883 F.3d 169, 178 (2d Cir. 2018). While the "transformative purpose" inquiry is conventionally treated as a part of first factor analysis, it inevitably involves the second factor as well. *Authors Guild v. Google, Inc*., 804 F.3d at 220. One cannot assess whether the copying work has an objective that differs from the original without considering both works, and their respective objectives. *Id.*

The third statutory factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The relevant consideration is the amount of copyrighted material made available to the public rather than the amount of material used by the copier. *Authors Guild v. Google, Inc.,* 804 F.3d at 222.

The Supreme Court observed in *Harper & Row Publishers, Inc. v. Nation Enterprises* that the fourth factor, which assesses the harm the secondary use can cause to the market for, or the value of, the copyright for the original, "is undoubtedly the single most important element of fair use." 471 U.S. 539, 566, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) (*citing* Melville B. Nimmer, 3 Nimmer on Copyright § 13.05[A], at 13-76 (1984)). It "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights

---

[9] *See also, e.g.*, *Nunez v. Caribbean International News Corp*., 235 F.3d 18, 25 (1st Cir. 2000) where a newspaper's copying of a photograph, a pictorial work, for reporting of a controversy in the newspaper, primarily a literary work, was deemed to be a transformative fair use by the First Circuit. A similar use was recognized as transformative in the Second Circuit's 2006 decision in *Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605, 609 (2d Cir. 2006) where a book about the Grateful Dead copied the band's various concert posters (pictorial works) for historical reference.

holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Authors Guild v. Google, Inc*., 804 F.3d at 223.[10]

> **(i)**      <u>**Plaintiff's Pleadings Have Alleged All Elements of Fair Use.**</u>

Plaintiff's Complaint has addressed each of the four elements necessary to support its claim that its inclusion of the de minimis excerpt from the 12 O'Clock Boyz video in its film was absolutely protected under the copyright doctrine of "fair use":

> Oscilloscope contends that: (1) the purpose and character of the 112-second Home Video Excerpt has been transformed through its incorporation into the Documentary by adding new expression or meaning to it in a way that did not exist before; (2) the Documentary, which is a polished, edited long-from documentary film whose story line is centered around the character "Pug" as it follows the ups and down of the youngster's life as he works toward his dream of someday becoming a 12 O' Clock Boy, with their ritualistic, albeit illegal, antics and police-baiting wheelies, despite his mother's well-reasoned objections; it is markedly different and distinguishable from the Home Video, which is roughly an hour long series of random footage taken by various people associated with the 12 O'Clock Boys group of dirt bike riders, which glorifies the unlawful practices of the group; (3) that the 112-second Home Video Excerpt is a de minimis taking; and (4) there was no negative effect on the potential market for or value of the Home Video caused by the use of the Home Video Excerpt in the Documentary.

DE-1, ¶71.

Moreover, the Complaint alleged in great detail how Plaintiff's work transformed the nature of the 112-second excerpt from the 12 O'Clock Boyz video, the heart of the fair use analysis, as follows:

---

[10] In the seminal fair use opinion in 1841, *Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841) (No. 4901), Justice Story explained the crucial difference between quoting a work to critique it and quoting a work to be a substitute for the work:

> "[A] reviewer may fairly cite largely from the original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism. On the other hand, it is as clear, that if he thus cites the most important parts of the work, with a view, not to criticise, but to supersede the use of the original work, and substitute the review for it, such a use will be deemed in law a piracy."

*Id.* at 344–45.

31. The Home Video Excerpt was introduced into the Documentary by the voiceover narrative of Pug explaining the impact that watching the Home Video had on him. As the camera transitions from a video close-up of Pug sitting on a stoop to the actual Home Video Excerpt, you hear Pug's benedictory voiceover continue into the beginning of the Home Video Excerpt (with a simultaneous printed overlay of his words), as follows:

> There was this tape I used to watch when I was little.
> I used to watch it with Tibba.
> It was made by the legends.
> The Founders.
> The 12 O'Clock Boys.

32. The juxtaposition of Pug and the Home Video Excerpt, and the transitioning introductory Pug narrative, transforms the Home Video from a simple home video recording of the daredevil antics of the original, legacy members (or "Legends") made at the time for their own use and entertainment, to a piece of historical propaganda that bridges the connection between legends of the past and young boy who has dreams of someday joining their pantheon.

33. Indeed, Pug's reference to watching the Home Video with his now dead brother Tibba further transforms the Home Video Excerpt into an emotionally unbreakable bond between the two siblings that transcends Tibba's death. It converts the Home Video from a pure piece of mindless entertainment to a painful reminder of the tragedy that continues to haunt its protagonist, Pug.

34. The use of the Home Video Excerpt in this manner in the Documentary thus transforms its purpose, character, meaning and message.

DE-1, ¶¶31-34.

The Complaint sets forth how Nathan's Documentary changes the *character* of the events depicted in the 2001 Home Video by providing new insights into the notorious urban dirt bike scene in Baltimore, including the original 12 O'Clock Boyz. It included an excerpt of only 112 seconds into a 76 minute feature film. Nathan's Documentary differs in fundamental aspects from the rough, grainy, amateurish footage excerpted from the Home Video. Nathan's film is in the nature of an extended news piece or commentary. It tells a story of the Baltimore riders who conquer the 12 O'Clock position with their dirt bikes and quads, from inception to 2013, including the cultural context.  It shapes its narrative using Ty'quan "Pug" Ford who aspires to be a 12 O'Clock Boy. The

13

*de minimis* excerpt is used solely to establish historical context, and the impact of Pug's watching

the 12 O'Clock Boyz video with his now deceased older brother. It depicts the dramatic tension

between Pug's aspirations to one day ride with their crew, the impact on Pug's family of Pug's

desire to become a 12 O'Clock Boy, and his family's opposition to Pug's plans.  It does not glorify

the conduct of the 12 O'Clock Boyz, whose antics are, in essence, a criminal act.  As such, Nathan's

film transformed the purpose, character, meaning and message of the short excerpt in such a way as

to provide Plaintiff with an unassailable "fair use" defense.  *See* DE-1, ¶¶31-34, 68-73.

### (ii).   Defendant Has Failed to Carry His Burden.

In stark contrast to Plaintiff's detailed allegations establishing its "fair use" defense to any

claim of copyright infringement, Defendant's Declaration, the only possible source of any factual

support for a meritorious defense to Plaintiff's position, provides as follows:

> 39.   Plaintiff claims that their use of our footage, if not under license from Mr. Whitaker, falls under the doctrine of fair use.
>
> 40.  I have been advised that the Court is the ultimate arbiter of what constitutes fair use. Plaintiff cannot rely on its own self serving statements to conclude that its use of our film is fair use.
>
> 41. The Defendants hold valid copyrights and trademarks, and the question of fair use is plainly a question of fact for determination by the Court.

Taje Dec., ¶¶39-41.  Defendant does not address any of the elements of the fair use analysis, and

does not provide any factual evidence that contradicts Plaintiff's allegations as to each of those

elements.

Defendant's legal argument on the "fair use" point is equally sparse and totally ineffective:

"Fair use is a mixed question of law and fact. *Pacific & Southern Co. v. Duncan,* 744 F. 2d 1490, 1495, n. 8 (CA11 1984). Where the district court has found facts sufficient to evaluate each of the statutory factors, an appellate court "need not remand for further factfinding . . . [but] may conclude as a matter of law that [the challenged use] do[es] not qualify as a fair use of the copyrighted work." Id., at 1495. "[S]ince the doctrine is an equitable rule of reason, no generally applicable

14

definition is possible, and each case raising the question must be decided on its own facts."

There has been no fact finding in the instant action, and the Court cannot make a determination as to Plaintiff's claims of fair use in the absence of an exchange of discovery and testimony."[11]

Taje Mem. p. 11.[12]

What Defendant's legal argument fails to comprehend is that the only facts before the Court concerning the "fair use" issue are those alleged in the Complaint.[13] By providing no evidentiary facts, Defendant fails to articulate a meritorious defense with a degree of specificity which directly relates that defense to the allegations set forth in Plaintiff's pleadings and raises a serious question as to the validity of those allegations. *Salomon v. 1498 Realty*, 148 F.R.D. 127, 130 (S.D.N.Y. 1993). This renders any purported meritorious defense to the other claims unavailing for purposes of vacating the default. *See Todtman, Nachamie, Spizz & Johns, P.C. v. Ashraf*, 241 F.R.D. 451, 456 (S.D.N.Y. 2007).

## C. **Defendants' Defense to the Copyright License Claim is Facially Insufficient.**

---

[11] Plaintiff's counsel understandably cites no case law that support this last argument for good reason – such a rule would render it impossible to default a non-responsive defendant where a declaratory judgment of fair use has been alleged.

[12] When lawyers take a position in litigation on behalf of a client, they should not only demonstrate awareness of the law pertaining to the client's claims, but should also describe how the relevant law favors the client's position. *China Mariners' Assur. Corp. v. M.T. W.M. Vacy Ash,* 96 Civ. 9553 (PKL), 1999 U.S. Dist. LEXIS 2674 *7 n.6 (S.D.N.Y. March 9, 1999). Plaintiff concedes the boilerplate legal concept that "fair use is a mixed question of law and fact". *Harper & Row Publishers v. Nation Enterprises,* 471 U.S. 539, 560, 85 L. Ed. 2d 588, 105 S. Ct. 2218 (1985). However, "[t]he mere fact that a determination of the fair use question requires an examination of the specific facts of each case does not necessarily mean that in each case involving fair use there are factual issues to be tried." *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1258 (2d Cir. 1986) *cert. denied,* 481 U.S. 1059, 95 L. Ed. 2d 856, 107 S. Ct. 2201 (1987). Moreover, the fact-driven nature of the fair use determination does not protect the copyright holder from summary disposition of its claims where there are no material factual disputes. *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991). What the proffered legal argument fails to address is that Defendant has abdicated his burden of submitting any evidence that would create a material fact dispute on the issue of fair use, so the legal argument has no relevance to this motion and thus does not favor or otherwise advance Defendant's position.

[13] As a consequence of the defendant's default, the well-pleaded allegations of the complaint are deemed admitted, except as to the amount of the plaintiff's damages. *See Janus v. Regalis Constr., Inc.*, 11-CV-5788 (ARR) (VVP), 2012 U.S. Dist. LEXIS 127008, *4 (E.D.N.Y. July 23, 2012).

### (i)   Defendant's Attempted Factual Adjustments Fail to Cure Legal Deficiencies.

Seeking to circumvent one of Plaintiff's challenges to his sister's motion to vacate, Defendant submits an affidavit from Michael ("Pee Wee") Whitaker, Jr., in an attempt to establish that Plaintiff did not receive a written or verbal license to use the 2001 video in Plaintiff's film.[14]

Mr. Whitaker's affidavit states that he is "not an author and/or owner of the [2001] 12 O'Clock Boyz VHS film" under the federal copyright statute, and, as a result, he is "not authorized to grant license" to Plaintiff.  Whitaker Dec., ¶6.  He also states that he did not "have any rights or claims in the 12 O'Clock Boyz VHS film" and that he "did not give written or verbal license" to Plaintiff.  Id. ¶¶6, 7.  He also states that "Taje Monbo is the sole author of 12 O'Clock Boyz VHS film" and that "Taje Monbo and Danielle Avent are the exclusive owners of the copyright in the [2001] 12 O'Clock Boyz VHS film."  Id. ¶¶8, 9. These statements are bald conclusions of law.

The only evidentiary facts included in Mr. Whitaker's Affidavit is his confirmation that he provided Lotfy Nathan with a copy of the 2001 VHS film and that he executed the General Release and Consent form that included the assignment language.  *Compare* Whitaker Dec., ¶¶10, 11 *with* DE-1, ¶¶28 (Whitaker delivered a copy of the 2001 Video to Lotfy Nathan), 29 (Whitaker signed a release and transfer of rights that included assignment of copyrights to any video recordings submitted to Nathan and the rights to use the video recordings in Nathan's film).

What Mr. Whitaker **did not state** under oath is that when he admittedly gave Nathan the 2001 VHS film, **that he did not say "'you can use the [Home Video] tape' in the**

---

[14] Defendant's totally unsupported allegation "Mr. Nathan . . . manipulated Mr. Whitaker in order to create a colorable appearance of authority" concedes for purposes of this motion that Mr. Whitaker's background as a founder and his continuing relationship with the 12 O'Clock Boyz group, his involvement as actor and videographer of the 2001 VHS film, his delivery of that film to Nathan, and his signing of the Consent and Release creates a colorable claim of apparent authority to grant the license at issue. "[A] claim is colorable 'when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim.'" *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 337 (2d Cir. 1999) (*quoting Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir. 1980) (*per curiam*)).

Documentary." *Compare,* Whitaker Dec., ¶10, *with* DE-1, ¶28.  He also **did not state that the General Release and Consent form that he admittedly signed did not include the quoted assignment of copyrights and consent to use all submitted video recordings provision**. *Compare*, Whitaker Dec., ¶11, *with* DE-1, ¶29.  He **did not state that he did not appear in the 2001 VHS film**, that he **did not do any of the recording of that Video**, **or that he did not make any of the statements attributed to him in that Video**. Whitaker Dec., *passim*.

Thus, Whitaker's bald legal conclusions that he is not "an author and/or owner" under the copyright act and "did not give plaintiff a written or verbal license" to use the 2001 VHS film is unsupported by any evidentiary facts.  As a result, Defendant Taje Monbo has failed to articulate a meritorious defense to Plaintiff's claim of a written and/or verbal license with a degree of specificity which directly relates that defense to the allegations set forth in Plaintiff's pleadings and raises a serious question as to the validity of those allegations. *Salomon v. 1498 Realty*, 148 F.R.D. 127, 130 (S.D.N.Y. 1993).

   **(ii)   Relevant Allegations by Plaintiff.**

In sharp contrast, Plaintiff alleged the following detailed facts that support its license claim in its Complaint, which remain uncontroverted by Defendant's motion:  (a) Whitaker is one of the founding members of the 12 O'Clock Boyz.  *DE-1,* ¶10;  (b) Whitaker, a so called biker "Legend", gave Lotfy Nathan a copy of a 2001 VHS home video styled street tape of the early days of the 12 O'Clock Boyz. *Id*., ¶22; [15] (c) Whitaker also appears in the Home Video and performs stunts typical of 12 O'Clock riders. *Id*. ¶24.  In the Documentary, just before the "title credit" for the Home Video

---

[15] Defendants continued refusal to produce a copy of either their 2001 or 2003 version of their videos (it is not commercially available anywhere) should be held against them. Notwithstanding that failure, however, Plaintiff's analysis is based on the Lotfy Nathan film (a DVD copy of the complete 75-minute film has been previously submitted to the Court), and the 112-second excerpt of the 2001 version incorporated therein. Plaintiff's submissions, along with Defendants' failure to submit either of their works, further vindicates Plaintiff.

Excerpt appears, Whitaker can be heard on a voiceover describing how *they filmed themselves* for

the Home Video: "Bike life…we started that type thing. If they say anything about bikes in this city,

they gonna mention me . . . We took the dirt bike thing, from just lookin' at it as a bike…we took it

to a whole 'nuther level. **We had bikes and we were just filmin' ourselves . . . playing with the**

**camera. And then one day, I just jumped up and was like, we gonna make us a group; we**

**gonna make a tape."[16]** *See* DE-40 (Meloni Reply Dec.), <u>Exhibit D</u>, at 15:57 – 16:59.[17] As such,

Whitaker, as both performer and videographer, is a co-author of the Home Video under 17 U.S.C.

§101 et seq. *Id.* ¶23.  Finally, when Whitaker delivered a copy of the Home Video to Nathan, he

told Nathan "you can use the [Home Video] tape" in the Documentary. *Id.*, ¶28.[18]

### (iii)   <u>Whitaker is an "Author" of the Home Video.</u>

The ownership of a copyright vests initially in the authors of the work. 17 U.S.C. §201(a).

Only modest "creativity," or intellectual labor, is required to show authorship. *Bleistein v.*

*Donaldson Lithographing Co.,* 188 U.S. 239, 250, 23 S. Ct. 298, 47 L. Ed. 460 (1903).

An author "in a constitutional sense" is one "to whom anything owes its origin; originator;

maker." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346, 111 S. Ct. 1282, 113 L. Ed.

---

[16] Given that Complaint clearly refers to the 112 second excerpt of the 2001 VHS film incorporated into Plaintiff's film, there is no dispute as to the excerpt's contents, it has been attached as an exhibit to these motions and Defendants have cited to its contents in support of their motions, this Court can treat Plaintiff's film, including the 112 second excerpt, as incorporated by reference into the Complaint.  *See Hvide Marine Int'l v. Employers Ins. of Wausau*, No. 88 CIV 1523 (LBS), 1989 U.S. Dist. LEXIS 13528, 5-6 (S.D.N.Y. Nov. 15, 1986).

[17] In the Nathan Documentary, there is also a 12 O'Clock rider holding a video camera filming nearby riders from a car. *See* DE-40, Exhibit D, at 18:06-18:19. The actor in this clip says: "That's what we do…train 'em (unintelligible)... That's what we do, you can take my bike…get the fuck away… I'm recording him. He recording me."  Mr. Whitaker does not deny appearing in the 2001 VHS film or making any of the statements attributable to him.  Whitaker Dec. *passim.*

[18] Defendant does not deny this fact.  Dkt. Nos., 32 & 33 and Taje Dec. and Whitaker Dec., *passim*.  Indeed, Defendants concede that the members of the group, including Whitaker, have worked together with Defendants since the beginning to this day to build their brand.  DE-32, ¶5; DE-33, ¶13. Moreover, with respect to the 2003 Paparazzi Edition, Taje admits that "Pee Wee Whitaker worked with Taje Monbo on the production of the 2003 Paparazzi Edition".  DE-33, ¶9, Taje Dec., ¶28.  These statements also concede that all the group members, including Whitaker, contributed to all of their creative decisions and are authors of their purported video.

2d 358 (1991) (*quoting Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58, 4 S. Ct. 279, 28 L. Ed. 349 (1884)). In other words, the creator of copyrightable artistic expression is an author. Thus, an actor's performance should be considered copyrightable works of authorship. *See Garcia v. Google, Inc.*, 743 F.3d 1258, 1272-1273 (9th Cir. 2013) ("Under the judicially enhanced joint work requirements," an actress's performance would be "physically inseparable from other cinematic contributions"). In most cases, and certainly in virtually all commercially exploited motion pictures, however, there are at least several, and often large numbers of, collaborators." *Id.* at 1271 (italics added). Works of choreography and pantomime are potentially works of authorship under current copyright law. 17 U.S.C. 102(a) (4).[19]

The Home Video is an "unedited VHS footage of the group riding around the streets of Baltimore performing individual or group stunts involving acrobatic maneuvering of the motorcycle and rider. It is interspersed with footage of some of the members talking, of interviews, or shots of people walking around the streets of Baltimore." Dkt No. 1, ¶25. Thus, the only real creative content consists of the riders, including Whitaker, performing their stunts, or giving interviews. Whitaker was also one of the videographers, which is another form of authorship.[20] *See* DE-40, Ex. G (Whitaker screen shot) and Ex. D, at 17:09 (Whitaker wheelie from Home Video Excerpt), and 15:57 – 16:59 (Whitaker voiceover).

---

[19] *See also Garcia v. Google, Inc.*, 743 F.3d 1258, 1263 (9th Cir. 2013) (court found that an actor's performance, when fixed, was copyrightable "if it evinced some minimal degree of creativity…. 'no matter how crude, humble or obvious' it might be.'"). The Ninth Circuit reasoned that an actor's performance, embodying "body language, facial expression and reactions to other actors and elements of a scene" amounts to copyrightable expression. *Garcia v. Google, Inc*., 743 F.3d at 1243. That is true whether the actor speaks, is dubbed over or, like Buster Keaton, performs without any words at all. Cf. 17 U.S.C. §102(a) (4) (noting "pantomimes and choreographic works" are eligible for copyright protection). It is clear that the stylized, choreographed and staged performances of riders like Whitaker meet these minimum requirements.

[20] The highly stylized and physically difficult stunts performed by riders such as Whitaker are no less creative than a pantomime, dancer or actor who performs stunts like Buster Keaton. The only difference is Whitaker uses a machine to accomplish his creative feats. Whitaker did precisely that for the Home Video and, as such, he was an actor, choreographer and creative contributor for the Home Video. What he added to it is original, expressive movement. Thus, it should be considered copyrightable subject matter, by analogy to pantomime and choreography.

As a joint author, Whitaker was also a joint owner of the copyright in the Home Video. Section 201(a) of the Copyright Act provides: "The authors of a joint work are co-owners of copyright in the work." A "joint work" is defined as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." *See* 1 *Nimmer on Copyright* §6.03 (2018) (citations omitted) ("a work that is the product of joint authorship, and is thus a joint work,  also means that each contributor automatically acquires an undivided ownership in the entire work, including all of the contributions contained therein"). As author and owner, Whitaker could and did grant both a written and verbal license to Nathan.

### (iv)    Whitaker Granted a Non-Exclusive License.

Whitaker signed a release and transfer of rights which provides in relevant part:

> 6. "*[I agree] [t]hat if I . . . submit any . . . original audio and/or video recordings ("Recordings") to Producer, I hereby represent and warrant that I own, control or have obtained all rights (including, without limitation, all copyrights) in and to any and all such . . . Recordings, and I hereby grant to Producer, without charge, the rights necessary to use such . . .  Recordings on and in connection with the Picture and the rights required to exploit the Picture and the ancillary rights therein as described anywhere in this Talent Release (including, without limitation, in advertisements, promotions and publicity), in any and all media now known or hereafter devised, or for any purpose, throughout the universe in perpetuity. I hereby represent and warrant that I have obtained all of the rights, clearances, and releases necessary for Producer to exploit said . . .  Recordings in connection herewith. . . .*" (italics added)

DE-1, ¶29; DE-40, Exhibit I (Whitaker "Consent & Release"") (italics added).

Justifiably relying on Whitaker's (now conceded) status as a co-founder and legacy member of the 12 O'Clock Boyz, his written release and license of rights in the Home Video he hand-delivered to Lotfy Nathan, and his verbal representation that "you can use the tape" in the Documentary, Lotfy Nathan selected 112 seconds of the Home Video provided by Whitaker (the "Home Video Excerpt") and incorporated it into the Documentary that was released by

Oscilloscope, transforming it in the process.[21] DE-1, ¶¶30, 59-61.  Given these uncontroverted facts, Red Gap, at minimum, obtained a non-exclusive license to use the 112-second Home Video Excerpt in the Documentary. *Id.*, ¶62. As the exclusive licensee of Red Gap for the distribution rights to the Documentary, Oscilloscope stands in the shoes of Red Gap. *Id.*, ¶63.  Plaintiff has a valid license to the Home Video Excerpt and cannot have infringed any purported copyrights therein. *Id.*, ¶64.

**(v)   Defendants Have No Meritorious Defense to the License Claim.**

Defendants do not contest Plaintiff's allegations that Whitaker was a performer in the VHS Tape of the video which he provided to Lotfy Nathan, or that Whitaker signed the written release and assignment.  *Compare* DE-1, ¶¶9-10, 22-24, 28-30, 59-64 *with* Dkt. Nos. 32, 33 & 38, and Taje Dec. and Whitaker Dec. *passim*.

Defendants' unsupported conclusory allegations and bald legal conclusions concerning their exclusive control over the rights in the video do not satisfy their burden to establish a meritorious defense.  *See Kauhsen v. Aventura Motors, Inc.*, Civil Action No. 09-4114, 2010 U.S. Dist. LEXIS 55554 *15 (E.D.N.Y. June 7, 2010) (Court castigated defendant's counsel for its "bald legal conclusions" and "absence of facts or information beyond conclusory assertions" in support of a meritorious defense).

**D.   Defendants' Defense to the Trademark Claims is Facially Insufficient.**

Plaintiff's Third Claim seeks, *inter alia*, a cancellation of defendants' federal Trademark registrations of the term "12 O'Clock Boyz" as both word and word + logo which Plaintiff alleges was procured by fraud because Defendants' have no legitimate basis to claim that they have used the Defendants' Mark in interstate commerce since June 25, 2001, that no other person, firm, corporation, or association has the right to use the Defendants' Mark in commerce, and that the name "12 O'Clock Boys" is anything more than a mere descriptive term for urban, dirt bike riders

---

[21] The Home Video Except starts at 16:56 of the Nathan film. DE-40, Ex. D.

in Baltimore who perform a specific stunt with their motorcycles and ATVs.[22] As such, it does not and cannot function as a source identifier for Defendants. *See* DE-1, ¶74-98.

Plaintiff's Fourth Claim seeks, *inter alia*, a declaratory judgment that Plaintiff, who has been actively marketing its film in interstate commerce under the title "12 O'Clock Boys" since 2013, is senior to the Defendants' mark "12 O'Clock Boyz", which was not registered until late 2015. *See* DE-1, ¶¶99-104. Taje Monbo has conceded this point with his corroborating statement that "Defendant's trademark filings were recently submitted to the United States Patent and Trademark Office". Taje Dec., ¶43.

Defendants allege that they are owners and authors of "12 O'Clock Boyz" standard character mark - Serial Nos. 86777306, 86756470, and design mark - Serial Nos. 86863708, 87312648. DE-33, ¶5 (iii), (iv); DE-32, ¶2 (iii), (iv); DE-38, p. 1-2, Tajes Dec., ¶2 (iii), (iv) and Taje Mem., p. 2.[23]  However, their only proof they have been exploiting the mark 12 O'Clock Boyz in interstate commerce since 2001 comes in the first instance from Defendant, Deafueh Monbo, identified by Taje Monbo as the person who "has typically handled the filings and enforcement of the 12 O'Clock Boyz intellectual property rights." DE-33, ¶12, Taje Dec., ¶8. Deafueh's only allegation on this issue is as follows:

> "*Upon information and belief*, the 2001 12 O'Clock Boyz film was the first independent urban dirt bike film sold in the Maryland, Washington DC and Virginia area; selling upwards of 50,000 units in two weeks".

---

[22] Defendants declare that they are the owner of two 12 O'Clock Boyz marks (word and design) in Classes 9, 25 and 41. DE-32, ¶5 (iii) and (iv), Taje Dec., ¶2(iii), (iv).  However, the only registration of any relevance to the trademark non-infringement claim is the word mark "12 O'Clock Boyz" in Class 9 (motion pictures), Reg. No. 4,992,835 / Serial No. 86777306. Defendants make no claim that Plaintiff used their logo, or that there has been any infringement of the marks registered in Class 25 (clothing) or Class 41 (movie filming services). In fact, Taje Monbo's only reference to the use by Plaintiff of their purported trademarks is in the use of "footage from our films without our permission" as reflected in the takedown notices sent out by Deafueh Monbo under Taje Monbo's authority. Taje Dec., ¶¶6-8, Taje Mem., p. 3.

[23] Their purported exclusive ownership in the mark "12 O'Clock Boyz" is controverted by their allegations that they and the other members of the group, which admittedly includes Whitaker, have been continuously working together since 2001 to this day to build a recognized brand. *See* DE-33, ¶13, DE-32, ¶5, DE-38, p. 2, Taje Dec., ¶6.

DE-32, ¶4.[24]  Deafueh's conclusory allegation based "upon information and belief" does not satisfy

the requirement that a meritorious defense must be supported by evidentiary facts based on personal

knowledge. *Feel Better Kids, Inc. v. Kids in Need USA, Inc*., CV-06-0023 (DRH) (AKT), 2012 U.S.

Dist. LEXIS 139770 *21-22 (E.D.N.Y. Aug. 27, 2012).  *See Jorgensen v. Epic/Sony Records*, 351

F.3d 46, 57 n. 8 (2d Cir. 2003) (a declaration stating "upon information and belief" is not

"admissible evidence").

Defendant's futile attempt to bolster his sister's submission consists of his unsupported

statement that Defendants "have been using the 12 O'Clock Boyz name as an identifier in the

production of artistic works and merchandise since 2001 (Exhibit F). [25] While Defendants'

trademark filings were recently submitted to the United States Patent and Trade Office, these marks

have been used consistently by the Defendant since 2001.  Defendants continue to utilize the marks

in interstate commerce with respect to 12 O'Clock Boyz properties and merchandise."  Taje Dec.,

---

[24] Tellingly, Defendant's Memorandum of Law on the present motion embellishes Deafueh's totally unsupported statement that the 2001 12 O'Clock Boyz VHS film was released in 2001 and sold in Maryland, Washington DC and Virginia – a statement which does not appear in Taj Monbo's Declaration – to state, without citation or any documentary support, that the "films were sold at bike shows, clothing and accessory stores, flea markets, college campuses and many other locations."  *See* Taje Mem., p. 2.  Moreover, Defendant's Memorandum of Law offers no legal challenge to Plaintiff's legal arguments or any legal support to Defendant's conclusory legal positions concerning trademarks in his declaration. Finally, Defendants offer no factual or legal support to overcome Plaintiff's claim that the descriptive mark, 12 O'Clock Boyz, which Defendants concede describes "a dirt-bike rider popping the perfect wheelie so that the dirt bike is facing up in the 12 O'Clock position" (Taje Dec., Ex. D) does not warrant trademark protection. *See* Taje Mem., *passim*.

[25] Taje Monbo's Exhibit F is an undated photograph of a white T-shirt with their purported <u>logo</u> mark, which is described in their Class 9 (motion pictures) registration Taje's Ex. D, as follows: "[t]he mark consists of a dirt-bike rider popping the perfect wheelie so that the dirt bike is facing up in the 12 O'Clock position".  The photograph does not establish independently that the t-shirt has ever been marketed or sold anywhere, at any time, by anyone. Moreover, Taje does not provide any evidence, other than his self-serving statements concerning "merchandise", relating to the marketing or sale of this t-shirt.  "The Supreme Court explained long ago that the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business*.*" *Buti v. Perosa, S.R.L*., 139 F.3d 98, 103 (2d Cir. 1998) (*citing United Drug Co. v. Theodore Rectanus Co*., 248 U.S. 90, 97 (1918)). The right of trademark ownership "exists only as a right appurtenant to an established business or trade in connection with which the mark is employed." *Id.*

¶43.   However, by providing no evidentiary facts to support his conclusory claims, Defendant fails to articulate a meritorious defense with a degree of specificity which directly relates that defense to the allegations set forth in Plaintiff's pleadings and raises a serious question as to the validity of those allegations. *Salomon v. 1498 Realty*, 148 F.R.D. 127, 130 (S.D.N.Y. 1993).

Moreover, no specimen of the Home Video is submitted, an omission that Deafueh also made in her related motion. An acceptable specimen is supposed to show the depiction of the mark as actually used on goods in commerce, and "must in some way evince that the mark is 'associated' with the goods and serves as an indicator of source." *In re Sones*, 590 F.3d 1282, 1288, 93 USPQ2d 1118, 1123 (Fed. Cir. 2009). Typically, with motion pictures, it could be packaging for a videocassette or DVD, or a photograph of a photo of a frame of a movie or video bearing the mark. For apparel, it could also be packaging, as well as tags and labels affixed to the garment indicting the source of the goods (*i.e.,* the trademark owner). [26] The only specimen submitted by Taje Monbo (Exhibit F – image of a T-Shirt with the neck portion, where a label would appear, cut off) lacks any identifying characteristics or features that one would be acceptable evidence of use in commerce. These failures demonstrate that they had not actually used their trademark in interstate commerce. [27]

---

[26] *See* TMEP §904.03(a): "In most cases, if a trademark is ordinarily applied to the goods or the containers for the goods by means of labels, a label is an acceptable specimen." *See also*  TMEP §904.03(f): "An acceptable specimen might be a photograph or printout of a display screen projecting the identifying trademark of a computer program, or a photograph of a frame(s) of a movie or video bearing the mark.  It is not necessary for purchasers see the mark prior to purchasing the goods, as long as the mark is applied to the goods or their containers, or to a display associated with the goods, and the goods are sold or transported in commerce."

[27] Trademark rights only arise out of the use in commerce of a specific and recognizable name or mark by which an individual's or entity's product or service may be distinguished over that of another. 15 U.S.C.A. § 1051. Trademark rights attach, on a limited basis, at common law through mere use of the mark in trade. A federal trademark registration does not, in and of itself, create a trademark. Registration without actual use does not confer rights to a trademark. A federal registration only confers certain procedural advantages to the owner under 15 U.S.C.A. §§1114-1118.

Based on the foregoing, and the total absence of any indicators that the Defendant's products were ever released or made available for sale or rental in interstate commerce, it appears that the trademark was not used on any goods in interstate commerce at the time the Class 9 application was filed (2016), thereby indicating a *prima facie* case of fraud under Section 14(3) of the Trademark Act, 15 U.S.C. § 1064(3), or abandonment under 15 U.S.C. § 1127.

    **E.** **Defendants' Trademark Claims Are Barred By *Dastar* and Nominative Fair Use.**

Due to page limitation restrictions, Plaintiff respectfully refers the Court to, and incorporates by reference herein, its arguments fully briefed on the above two issues appearing as points E and F, on pages 22 -- 30 in DE-39.  They apply as stated with equal force and merit to this motion.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion in its entirety, together with such other and further relief as it deems just and proper.

Dated:  August 17, 2018

                    Respectfully submitted,

                    MELONI & McCAFFREY
                    A Professional Corporation

                    By: _____
                          Robert S. Meloni
                          Thomas P. McCaffrey
                    3 Columbus Circle, 15th Floor
                    New York, New York 10019

                    *Attorneys for Plaintiff*